Gary L. CATTIN, and Thomas F. Omans, Individually, and as Representatives of a class of individuals similarly situated, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, a Delaware Corporation, and Electronic Data Systems Corp., Defendants.

Civ. A. No. 84–8601.

United States District Court, E.D. Michigan, S.D.

Aug. 8, 1986.

---

Jules B. Olsman, Edmund O. Battersby, Woll, Crowley, Berman & Olsman, P.C., Southfield, Mich., for plaintiffs.

David M. Davis, Office of Gen. Counsel, General Motors Corp., Detroit, Mich., Terence V. Page, Clark, Hardy, Lewis, Pollard & Page, P.C., Birmingham, Mich., for defendants.

## OPINION

FEIKENS, District Judge.

Plaintiffs, Gary Cattin ("Cattin") and Thomas Omans ("Omans"), are former employees of defendant General Motors Corporation ("GM"). They both worked in the data processing department of GM for twenty-seven years before they were transferred to defendant Electronic Data Systems ("EDS") on January 1, 1985.[1] GM had acquired EDS, a large data processing firm, as its wholly owned subsidiary in 1984. Plaintiffs were informed by GM and EDS in November 1984 that after they transferred to EDS on January 1, 1985, they would not be able to gain at EDS the three additional years of credited service which would entitle them to retire under the early retirement provisions of the GM Retirement Program for Salaried Employees ("GM Retirement Program").[2] Both plaintiffs had planned to retire under this "thirty and out" program; Omans would have been eligible on June 5, 1987, Cattin, on December 23, 1987.

Plaintiffs' claim against GM is that they are entitled to remain eligible for the thirty and out program even though they now work for EDS. This claim is based on contract law and, alternatively, on promissory estoppel law. Plaintiffs' other claim is against GM and EDS and is for the acquisition of "special recognition stock" that they were promised before they transferred to EDS.[3]

---

1. Omans' final position at GM was Senior Staff Assistant, Data Processing. His position at EDS is Systems Administration and Accounting Manager. Cattin's final position at GM was Systems Analyst Programmer; at EDS he is a Data Security Officer.

2. Under the GM Retirement Program, an employee may retire voluntarily at or after age 55, or after the completion of thirty years of credited service with GM. (D.Ex. 3, Section, Art. II, 2). Because this program is often referred to as the "thirty and out" program, I shall refer to it as such.

3. In my Memorandum Opinion on EDS's motion for Partial Summary Judgment, dated September 30, 1985, I ruled that the plaintiffs did not have a claim for the stock based on contract. I note also that on February 13, 1986, I denied plaintiffs' Motion for Class Certification in this case.

Plaintiffs thus seek an order requiring GM to allow them to accrue additional years of credited service toward GM's thirty and out program while they work for EDS and an order requiring GM and EDS to permit them to participate in the stock purchase agreement.

I have jurisdiction in this matter under 29 U.S.C. § 1132.[4] Plaintiffs originally claimed that GM's effective termination of their eligibility for the thirty and out program violated the vesting and non-forfeiture requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1053(a). Although plaintiffs subsequently conceded that this claim was legally insufficient, and I granted GM's motion for summary judgment on this issue in my Memorandum Opinion and Order of June 27, 1985, 612 F.Supp. 948, I retain jurisdiction over the thirty and out claim, based in contract, under the broad provision of 29 U.S.C. § 1132(a)(1)(B). This provision allows a participant or beneficiary of a pension plan to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." In addition, I have pendent jurisdiction over the stock claim. *United Mine Workers v. Gibbs*, 383 U.S. 715, 724, 86 S.Ct. 1130, 1137, 16 L.Ed.2d 218 (1966).

## I. BACKGROUND

On September 21, 1984, the GM Board of Directors announced to its shareholders, and sought approval from them of, its proposal to acquire EDS. Approval was obtained and the acquisition of EDS as a wholly-owned subsidiary was completed on October 18, 1984.[5] At a meeting on November 1, 1984, plaintiffs, and other employees involved in the data processing division, were informed that GM had acquired EDS, that EDS would assume responsibility for all of GM's data processing and communication activities, and that the approximately seven thousand GM employees involved in data processing would be transferred to EDS.

At this meeting, plaintiffs were told that upon transfer to EDS they would, after December 31, 1984, cease their active participation in GM benefit plans, but that they would maintain entitlement to accrued benefits under the GM Retirement Program, based upon completion of twenty-seven years of credited service.[6] They would also be allowed to participate in the EDS Retirement Plan. Of particular concern to plaintiffs, however, is the fact that their years of employment service would not count as credited service applicable to the thirty and out program. GM had amended its Retirement Program to eliminate this.[7] Plaintiffs' twenty-seven years

---

4. A bench trial took place July 7, 8 and 10. This opinion constitutes the findings of fact and conclusion of law required by Fed.R.Civ.P. 52(a).

5. This was accompanied by the authorization to issue 190 million shares of GM Class E common stock.

6. Plaintiffs remain entitled to several types of accrued benefits under the GM Retirement Program. The GM Retirement Program consists of two parts. Part A provides a basic benefit based on years of credited service. Part A also provides certain early retirement supplements. Part B of the program provides benefits for those employees who elect to make monthly contributions under the program. For employees who contribute under Part B, a primary benefit is payable upon retirement based on contributions made during employment. A Part B Supplementary Benefit is also available for employees who contribute at all times while

eligible and do not withdraw contributions prior to termination of employment.

Part A basic benefits and both Part B Primary and Supplementary benefits are reduced actuarily for age for employees participating in the early retirement program.

Both Part B Primary and Supplementary benefits are "accrued benefits" defined at ERISA 3(23), 29 U.S.C. § 1002(23), and are subject to provisions of ERISA 203 and 204, 29 U.S.C. §§ 1053 and 1054.

7. On October 3, 1984, the Board of Directors of GM authorized an amendment to the GM Retirement Program, which would exclude from participation, including credited service:

Employes of any directly or indirectly wholly-owned or substantially wholly-owned subsidiary of the Corporation formed or acquired on or after March 1, 1984 unless specifically approved by the General Motors Corporation Board of Directors.

of service with GM would instead be applied to satisfy the vesting requirements of the EDS retirement plan.[8] In short, plaintiffs were informed that after they transferred to EDS, they would not be able to gain the three additional years of credited service which would allow them to participate in GM's thirty and out program. Plaintiffs filed suit as to this issue on November 19, 1984.

At the November 1, 1984 meeting, plaintiffs were also given other information regarding their prospective employment with EDS, including a pamphlet entitled "A Special Welcome to ... EDS." (P.Ex. 5). On Page 9, plaintiffs were informed that they would receive special recognition stock following their transfer to EDS:

> Special Recognition Stock: As a special recognition for GM employes with at least one year of service, a grant of new EDS stock will be given. The number of shares will be determined from a sliding scale, beginning at 100 shares, and will be based on the individual's years of service and age. The purpose of this special recognition stock grant is to recognize that past service and performance at GM will translate into a major contribution to the new EDS.

Plaintiffs received additional information regarding the stock grant in personal letters dated November 12, 1985 from the President and Senior Vice President of EDS. (P.Exs. 6, 7). These letters stated in part:

> This letter gives me the exciting opportunity to personally tell you that after you become an employee of the new EDS, EDS and GM intend to offer a "Special Recognition" grant under a new Stock Incentive Plan (SIP). The SIP will enable grants to be issued covering General

Motors Corporation's new Class E Common Stock, a class of GM equity securities, the market performance of which is intended to be related to the future business performance of the new EDS.... Under this proposed grant, you will have the opportunity to purchase [_____] shares of Class E Common Stock at a nominal price of 10 cents per share. This grant will occur as soon as a definitive Prospectus is available. We expect this to be accomplished before year-end. A Prospectus is the only means by which an offer can be made relating to participation in the SIP.

>    .    .    .    .    .

> I want you to remember that this initial grant is based *primarily* in consideration of your prior service and experience with GM.

By this letter, Omans was promised the opportunity to purchase 930 shares of stock, and Cattin was promised the opportunity to purchase 870 shares of stock.[9]

On February 15, 1985, after plaintiffs had transferred to EDS, they were given the opportunity to purchase the special recognition stock. On that date, EDS set out the details for the purchase of the stock: (1) an explanatory cover letter; (2) a restatement of the special recognition grant; (3) the EDS Restricted Stock Agreement; and (4) a summary of the Restricted Stock Agreement. (P.Exs. 8, 9).

The cover letter explained that the restricted stock agreement was subject to specific conditions, including a "Buyers Release," which required all transferred GM employees to release GM and EDS from any and all claims relating to transfer to EDS, including claims for breach of employment contract, either express or implied.[10] Plaintiffs first learned that such a

---

This amendment was incorporated into the GM Retirement Program when the IRS approved it on April 1, 1986. The amended language was retroactive to October 3, 1984.

**8.** Under the EDS retirement plan, plaintiffs would be eligible for early retirement at age 55. (D.Ex. 2, p. 13).

**9.** As of the date of trial, Omans' share would have been worth over $90,000, while Cattin's share would have been worth over $80,000, on a projected basis over ten years, assuming present values.

**10.** The Buyer's Release, contained on page 5 of the Restricted Stock Agreement, states:

release clause would be included in the offer of stock when they received the restricted stock agreement on February 15, 1985.

Plaintiffs refused to sign the stock agreement containing the release clause because the release would have required them to give up their lawsuit concerning the thirty and out benefits. When they refused to sign the restricted stock agreement, plaintiffs were not permitted to purchase the stock.

## II. THE THIRTY AND OUT CLAIM

Plaintiffs claim they have a contractual right to GM's thirty and out program and that, despite their transfer to EDS, they should be allowed to accrue time toward this program while working at EDS. They have conceded that the non-forfeiture and vesting provisions of ERISA do not apply to this benefit. However, they argue that even though ERISA does not specifically prevent the termination of early retirement benefits, "nothing in ERISA indicated that Congress intended to make contracts unenforceable," citing my decision in *Holliday v. Xerox Corp.*, 555 F.Supp. 51, 55 (E.D. Mich.1982), *aff'd* 732 F.2d 548 (6th Cir. 1984), *cert. denied*, 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984). In *Holliday*, I found that the parties themselves could create a contractual obligation by and through statements contained in pension plans. *Id.* at 56. *See also In re: White Farm Equipment Company*, 788 F.2d 1186, 1193 (6th Cir.1986); *Sedman v. Michigan Bell Telephone Co.*, 125 Mich.App. 761, 767, 336 N.W.2d 868 (1983).

Plaintiffs thus argue that the GM Retirement Program created a contractual right to the thirty and out benefit. They cite the GM Retirement Program booklet that was available to them in 1984 which stated that credited service as it was used included employment

> with any company (including service with any directly or indirectly wholly owned or substantially wholly owned subsidiary of such company) of which substantially all the assets have been acquired by [GM] or its subsidiaries. . . .

(P.Ex. 1, Part A, Art. III, 1(a)(1)).

But the GM Retirement Program clearly negates such a contractual right. In its program, GM reserved a right to amend or terminate its General Provision, Section 8(a), which states: "The Corporation reserves the right, by and through its Board of Directors, to amend, modify, suspend, or terminate the Program in the future." GM exercised this right by amending its Retirement Program to exclude from credited service

> any directly or indirectly wholly-owned or substantially wholly-owned subsidiary of [GM] acquired or formed by [GM] on or after March 1, 1984 unless specifically approved by the [GM] Board of Directors. . . .

(P.Ex. 3, Section A, Art. III, 1(a)(1)). This provision became effective October 3, 1984. *See, supra,* note 7. In addition, General Provision, Section 14, was amended to specifically address the status of the new EDS employees. The new Section 14(f) stated that "no additional credited service shall accrue under this Program for any such transitioning employe."

In the face of this clear reservation of the right to amend, and the subsequent amendments by GM, plaintiffs still maintain that since the reservation provided by General Provision, Section 8, contains "multiple contingencies," the reservation is somehow unclear, and that if I find a right

---

In consideration of the grant and sale of shares of Class E Stock pursuant to this Agreement, Buyer hereby releases and forever discharges GM and [EDS], their officers, directors and employees from all claims, demands and causes of action, known or unknown, which Buyer may have based upon or relating to his transfer to [EDS], including any claim, demand or cause of action arising under any state or federal law or regulation relating to employment and any claims for breach of employment contract, either express or implied. Buyer further agrees not to institute any proceeding, suit, action at law or in equity against GM, [EDS] or their officers, or directors, agents, employees, or stockholders, based on any of the matters covered by the release set forth above.

of amendment or termination, it would be by "implication and/or construction." They insist that this reservation would create a forfeiture, and that forfeiture by implication is to be avoided. *In the Matter of Erie Lackawanna R.R. Co.*, 548 F.2d 621 (6th Cir.1977).

■ I find GM's reservation of its power to amend or terminate clearly stated. It exists not by implication or construction, but in the plain meaning of General Provision, Section 8. The multiple contingencies that plaintiffs cite do not obscure this reserved right, but clarify the process by which benefits vest. *Lackawanna* is distinguishable. There, the Court had to interpret the effect of an Ohio law restricting the power of even an express reservation of the power to terminate. Because Ohio law did not give guidance as to the scope of this restriction, the Court interpreted the law in order to avoid forfeiture. There is no such problem in the present case.

Plaintiffs would only have a vested right in the thirty and out program if they had actually been employed for thirty years with GM. Because they now work for EDS, they will never be able to meet this condition. *See Chesser v. Babcock & Wilson*, 753 F.2d 1570 (11th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 112, 88 L.Ed.2d 91 (1985) (holding that it was not inequitable that employees having over twenty-five years of service, but less than the required thirty years of service, would not be eligible for early retirement benefits because they did not have, and would not be able to attain, the requisite years of service).[11]

■ In addition, there is no evidence that an implied contract was formed in which GM promised not to exercise its right to terminate or amend. Nor do the facts in this case give rise to a claim under *Toussaint v. Blue Cross & Blue Shield of Mich-*

*igan*, 408 Mich. 579, 292 N.W.2d 880 (1980). In *Toussaint*, defendant repeatedly assured the plaintiffs that, despite the fact that their contracts stated they could be terminable at will, plaintiffs would only be terminated for "just cause." Here, no such *Toussaint* promises, assurances or representations were given. Plaintiffs have stated that they had always expected to retire under the thirty and out program. But under *Toussaint*, mere expectations do not become rights unless the employer somehow represents a condition different from that stated in the contract.

■ Plaintiffs have also claimed that promissory estoppel prevents GM from amending the GM Retirement Program to prevent EDS work from counting as credited service. But, a successful promissory estoppel claimant must prove, as a first element, the existence of a promise. *Motobecane America, Ltd. v. Patrick Petroleum Co.*, 791 F.2d 1248, 1251 (6th Cir.1986); *Clark v. Coats & Suits Unlimited*, 135 Mich.App. 87, 352 N.W.2d 349 (1984). For the reasons I have outlined, I find that there is no promise contained in the GM Retirement Program not to exercise its power to amend or terminate parts of the Program.

In sum, I find that plaintiffs do not have a contractual right, either express or implied, to eligibility in GM's early retirement program. Nor is the doctrine of promissory estoppel applicable. If the plaintiffs were still employed at GM, GM could have terminated this early retirement program. The fact that GM amended its program to effectively exclude plaintiffs from participation in this program must yield the same result.

### III. STOCK GRANT

Plaintiffs also claim that they have been

---

11. The court stated: "But when a plan exceeds the minimum requirements of ERISA, the employer is acting *ex gratia* with respect to such excess coverage and is liable only for such bene- fits as are voluntarily agreed to by the employer and are specified in the terms of the plan, and the employee must comply with the terms of the

wrongfully deprived of a stock grant.[12] This stock grant, referred to as "special recognition stock," was set forth in an informational pamphlet received by all affected GM employees, including plaintiffs, on November 1, 1984, and a personal letter, dated November 12, 1984, to plaintiffs. *See, supra,* pages six and seven. GM and EDS responded that they fulfilled their promise to plaintiffs by offering them the stock referred to in the stock grant; this they did on February 15, 1985, and they argue that plaintiffs, having refused to sign the restricted stock agreement accompanying the stock grant, did not meet an important condition of the offer. To this plaintiffs reply that the stock agreement contained a never-before-mentioned release clause which would have required them to relinquish their claims against GM for early retirement benefits (thirty and out).

Earlier, on EDS' motion for partial summary judgment, I held that plaintiffs could not sustain their claims for the stock based on a theory of contract. I did indicate in that holding that they could pursue their stock claims on a theory of promissory estoppel.[13] I note, too, that plaintiffs, in their second amended complaint, seek "such other relief as the Court shall deem necessary and proper in this matter."

I am of the opinion that plaintiffs have a strong claim for equitable relief. The power of equity is as broad as justice requires. 27 Am.Jur.2d *Equity* § 103. As stated in *Bowen v. Hockley,* 71 F.2d 781, 786 (4th Cir.1934):

> One of the glories of equity jurisprudence is that it is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life.... If relief had been granted only where precedent could be found for it, this great system would never have been de-

veloped; and if such a narrow view of equitable powers is adopted now, the result will be the return of the rigid and unyielding system which equity jurisprudence was designed to remedy.

*See also* 27 Am.Jur.2d *Equity* § 103, note 14, and cases cited therein. Equity will suffer no wrong to be without a remedy. *Leo Feist v. Young,* 138 F.2d 972, 974 (7th Cir.1943); *Jones v. Campbell-Taggart Associated Bakeries,* 63 F.2d 58, 60 (5th Cir. 1933). Equitable relief will order done what in good conscience should be done. *United States v. Roadway Express, Inc.,* 457 F.2d 854, 856 (6th Cir.1972); *Woods v. Witzke,* 174 F.2d 855, 856 (6th Cir.1949); *Thill v. Danna,* 240 Mich. 595, 216 N.W. 406 (1927) ("Equity looks at the whole situation, and grants or withholds relief as good conscience requires.").

■ In my view it would be unconscionable for defendants to deny plaintiffs a stock grant since it clearly appears that all other employees who transferred to EDS were given that right of participation. It is clear that plaintiffs have worked faithfully and long for GM for twenty-seven years, that plaintiffs have transferred their employment to EDS as GM had requested and desired, that plaintiffs are satisfactory employees at EDS and have received promotions, and that their situations are completely similar to the thousands of other employees who transferred and received stock grants. Even though plaintiffs were mistaken as to their claims for early retirement benefits (thirty and out), this mistake should not preclude equitable relief. 27 Am.Jur.2d *Equity* § 33 (Mistake on the part of one party and equitable conduct by the other party can justify equitable relief.).

Defendants clearly promised the data processing employees of GM that when they transferred to EDS, a stock grant

---

plan in order to be entitled to such benefits." *Id.* at 1573.

**12.** Plaintiffs' claim for the stock is against both GM and EDS. Although the promise of stock came from EDS, the stock was for past recognition at GM, and was GM stock. In addition, the

planning of the stock grant was done jointly by GM and EDS.

**13.** This claim was added as a second amended complaint, which was allowed to be filed by my order of August 7, 1986.

would be available to them in recognition of past service and to induce them to transfer. There is ample testimony in the record to support this. Even though plaintiffs were mistaken as to their benefits claim, it is understandable that when, after they had transferred to EDS on December 31, 1984, and when they learned on February 15, 1985 that they had to sign a release of any claims for early retirement benefits (thirty and out), that they refused so to do. That plaintiffs acted in this fashion neither excuses nor makes the conduct of defendants understandable.

To put it simply: Plaintiffs were promised a stock grant upon transferring. They mistakenly concluded that they were entitled to early retirement benefits *when they were not.* They started suit and, after they had transferred to EDS (one and one-half months later), they were informed that they had to give up their lawsuit in order to obtain the stock grant. What is inequitable in the conduct of the defendants is that they were requiring a release of rights by plaintiffs, which rights they contend plaintiffs did not have. Defendants cannot have it both ways. If plaintiffs have no right to early retirement benefits (thirty and out), then defendants should not have sought a release of these rights.

Under these circumstances it would be unconscionable for the defendants to be permitted to withhold stock grants from them.

## IV. CONCLUSIONS OF LAW

Accordingly, I conclude that:

1. Plaintiffs have no contractual right, either expressly or by implication, to retire under GM's early retirement program (thirty and out); GM expressly reserved the right to amend or terminate that program and it exercised that right of amendment. Nor can plaintiffs claim such right on equitable grounds of estoppel; and

2. Plaintiffs are entitled, however, to participate in the stock purchase

agreement, nunc pro tunc, on equitable grounds.

An appropriate order may be entered.