Gary L. CATTIN and Thomas F. Omans, Plaintiffs,

v.

GENERAL MOTORS CORPORATION and Electronic Data Systems Corporation, Defendants.

No. 84–CV–48601.

United States District Court, E.D. Michigan, S.D.

Nov. 5, 1992.

Jules B. Olsman, Edmund O. Battersby, Woll, Crowley, Berman & Olsman, P.C., Southfield, Mich., for plaintiffs.

David M. Davis, Office of Gen. Counsel, General Motors Corp., Detroit, Mich., Terence V. Page, Clark, Hardy, Lewis, Pollard & Page, P.C., Birmingham, Mich., for defendants.

OPINION AND ORDER

FEIKENS, District Judge.

For a more complete recitation of events that have led to Plaintiffs' Motion for Supplemental Relief, *see* opinions in *Cattin v. General Motors Corp.*, 955 F.2d 416 (6th Cir.1992), *Cattin v. General Motors Corp.*, 641 F.Supp. 591 (E.D.Mich.1986), and *Cattin v. General Motors Corp.*, 612 F.Supp. 948 (E.D.Mich.1985). Now, before me, is Plaintiffs' Motion for Supplemental Relief

in which I am asked to decide if plaintiff Gary L. Cattin ("Cattin") should receive the entire grant of General Motors Corporation ("GM") Class E Common Stock even though Cattin left Electronic Data Systems Corporation ("EDS") at age fifty-two. Defendants say that under the terms of the Restricted Stock Agreement between defendants and GM employees transferring to EDS, Cattin's stock can only fully vest upon his retirement after age fifty-five. In this opinion, I find that Cattin is not entitled to receive the entire stock grant.

The starting point of my analysis is the Restricted Stock Agreement ("Agreement") itself. Pursuant to a Special Recognition Grant under a Stock Incentive Plan, GM employees transferring to EDS were given the right to purchase a specified number of shares of GM Class E Common Stock based generally on their age and on past service with GM at a purchase price of $.10 per share. The grant of stock would vest at the rate of ten percent per year thereafter. Under the terms of the Agreement, if a participant terminates employment with EDS for any reason other than death, total disability, normal retirement, or early retirement, EDS or GM has the option to buy for cash all of the unvested shares sold to the participant at the price paid by him (Agreement, Para. 4(e)).[1]

> "Early Retirement" and "Normal Retirement" shall mean the discontinuance of employment of a participant in accordance with the early and normal retirement provisions, respectively, of the Electronic Data Systems Corporation Retirement Plan, as amended.

Agreement, Para. 8. Under the EDS Retirement Plan, the earliest retirement date is upon the attainment of age fifty-five, and one's age plus years of service must equal seventy points.

■ Previous litigation in this case has resulted in plaintiffs being allowed to participate in this stock grant. Under the rules described above, Cattin would have been able to purchase 870 shares of stock, and the grant would have been fully earned out if he continued employment with EDS until January 1995. However, Cattin left employment with EDS effective July 1, 1990, when he was fifty-two and therefore ineligible for Early Retirement under the EDS Retirement Plan. As a "quit" from EDS at a time when he had completed only five years of the ten year earnout requirement, Cattin was entitled to receive only 435 shares, fifty percent of the grant. Because of three two-for-one stock splits, the 435 shares now equal 3480 shares.

Had Cattin retired from EDS at or after attainment of age 55, the earliest retirement age under the EDS Plan, he probably would have received the entire grant. Paragraph 4(g) of the Agreement states:

> If Buyer's employment with the Company is terminated prior to the close of business on the last Vesting Date because of Early Retirement, then at the option of the [Stock Incentive Plan] Committee: (i) GM or EDS may repurchase such of the shares of Unvested Stock at the Buyer's original purchase price as the Committee shall determine at such time in its sole discretion; or (ii) the other restrictions imposed and still existing upon any or all shares of Unvested Stock shall lapse or shall be removed in accordance with the vesting schedule specified herein or as shall be determined at such time in the sole discretion of the Committee.

According to defendants, the Stock Incentive Plan Committee has uniformly administered this provision such that any participant who left employment with EDS prior to full vesting, by reason of early retirement after December 31, 1988, has been allowed to continue to vest the remaining shares granted. For example, because

---

**1.** Paragraph 4(e) of the Agreement states: "If Buyer's employment with the Company is terminated prior to the close of business of the last Vesting Date for any reason other than death, Total Disability (as defined in Paragraph 8 hereof), Normal Retirement (as defined in Paragraph 8 hereof), or Early Retirement (as defined in Paragraph 8 hereof), EDS or GM (as designated by the Committee) shall have the option to buy for cash all of the shares of Unvested Stock sold to Buyer at the cash price paid by him." In the Recitals, "Company" is defined as EDS and its subsidiaries.

plaintiff Thomas F. Omans left employment with EDS after reaching age fifty-five thereby fulfilling the early retirement requirements under the EDS Retirement Plan, he is entitled to receive the unvested shares of his grant.

Plaintiffs make several arguments why Cattin is entitled to receive the entire grant of GM's Class E Common stock rather than the fifty percent portion allowed for under the Restricted Stock Agreement. First, plaintiffs say that there are other individuals who have left EDS before reaching the age of fifty-five who are receiving the full amount of the stock grant. Defendants admit that fifty-four of 906 former EDS employees continue to vest stock under the stock grant even though their separations from EDS occurred prior to eligibility for early retirement.[2] Defendants note that Paragraph 4(e) of the Agreement, as described above, specifically gives EDS or GM the *option* of purchasing all shares of unvested stock at the original purchase price of $.10 per share. EDS or GM has complete discretion in deciding whether to purchase a former employee's unvested shares in such a situation. Plaintiffs acknowledge this power when they stated in their brief: "The Court is urged to take into consideration the fact that the ability to grant the full stock grant is discretionary on the part of the defendants." Plaintiffs' Brief at page 2.

In eleven of the fifty-four cases, the employee was allowed to continue to vest unvested shares as part consideration for the settlement of pending legal actions. Thirty-three individuals were allowed to continue to vest their unvested shares because their separations from EDS were involuntary due to plant closings, account closings, or positions being eliminated. Three individuals were allowed to continue to vest their unvested shares because of serious health problems. One was allowed to continue to vest his unvested shares because of family hardship. Four individuals were allowed to continue to vest their unvested shares because of management recommendation. In all of these cases, the Stock Incentive Plan Committee ("Committee") waived its option to repurchase the unvested shares. The vesting of full stock grants for two other former employees was a mistake due to the erroneous interpretation of termination codes entered by computer on the employees' files.[3] Thus, in only fifty-two of 906 cases did the Committee act to waive its option of repurchase. Unlike the above described situations, Cattin's separation was voluntary at a time when he could have remained employed with EDS; his separation was not a result of illness or other extenuating circumstances.

■ Further, plaintiffs claim that statements made by then-GM Chairman Roger Smith at 1988 and 1990 shareholder meetings are completely contrary to evidence introduced by GM during the 1986 trial in this case. For example, at the May 25, 1990, plaintiffs contend the following conversation occurred:

> *Chairman Smith:* Mr. Besancon, I think we ought to point out that when you transferred from GM to EDS, you were given stock in a value to make up for the difference in the retirement programs; is that not true?

Transcript, GM Shareholders' Meeting, May 25, 1990, p.63. Plaintiffs claim that this statement, among others, refutes defendants' position during trial that the stock grant was not an employee benefit plan; plaintiffs claim that if the stock grant was intended to make up for a loss of pension benefits, then the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, would be involved. Plaintiffs claim they would have been prevailing parties under ERISA and therefore entitled to attorney's fees. However, Mr. Smith's oral statements lack support in the Agreement and are contrary to the purpose of the plan as

---

**2.** Normal retirement, death, or total disability also did not play roles in allowing these fifty-four individuals to continue to vest their unvested shares.

**3.** For example, plaintiffs have located a woman, Delores Johnson, living in Florida Delores Johnson who left EDS prior to obtaining fifty-five years of age but ·nonetheless who is receiving the full stock grant.

set forth in the Prospectus.[4] Because such oral statements run afoul of the parol evidence rule, they can not be introduced into evidence and can not be considered by this court. *See Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1294 (6th Cir.1991).[5]

█ Also, plaintiffs claim defendants are seeking to penalize Cattin for taking advantage of a retirement benefit that did not exist at the time of the Agreement's 1985 creation. Plaintiffs say they received a letter from GM dated October 13, 1989, in which they claim GM stated it would now allow an individual with combined service between GM and EDS to retire under the General Motors Retirement Plan. Such an assertion is incorrect. The October 13, 1989, letter says that an individual transferred from GM to EDS who had worked at GM for less than thirty years cannot tack on his years worked at EDS to his years worked at GM. In other words, the years worked at EDS cannot be considered years worked at GM. Such an individual would be ineligible to commence retirement under the GM Retirement Plan. Thus, the October 13, 1989, letter states the exact opposite of what plaintiffs say it declares.

However, what plaintiffs claim the October 13, 1989, letter dictates is actually enshrined in a GM letter dated March 6, 1990. Although this letter says it merely supplements the October 13, 1989, letter, in reality, it greatly modifies the earlier letter. The March 6, 1990, letter says that those GM employees who transferred to EDS can *retire from GM* upon completion of at least thirty years of combined service with GM and EDS as long as they leave EDS prior to age fifty-five. Cattin satisfied these conditions and elected to retire under the GM Retirement Plan.

Cattin claims that by not giving him the full stock grant, defendants are punishing him for taking advantage of this option to retire under the GM Retirement Plan. However, the March 6, 1990, letter clearly states:

> This modification announcement applies only with respect to GM retirement benefits; it has no effect on any eligibility you may have for (1) other GM benefits (*e.g.*, health care), or (2) EDS benefits. *If you separate from EDS prior to age 55, you would not be eligible to retire from EDS.* However, you would be eligible to receive deferred vested retirement benefits from EDS at age 65, or as early as age 55, on a reduced for age basis.

(emphasis added). The Restricted Stock Agreement states that only if a person *retires from EDS* at age fifty-five or greater can he received the full amount of stock.[6] The March 6, 1990, letter did not modify the Agreement in any way.

Cattin clearly had a choice. He could wait until at least age fifty-five to retire from EDS thereby entitling himself to the full stock grant, or, alternatively, prior to age fifty-five he could retire from GM under the GM Retirement Plan. Between these two different options, Cattin chose the latter. No one is punishing him for making this decision; he simply cannot choose one exclusive option over another and expect to reap the rewards from both options. Plaintiffs' Motion for Supplemental Relief is denied.

IT IS SO ORDERED.

---

**4.** "1. Purpose of the Plan. The purpose of the Plan is to provide corporate officers and key employees of Electronic Data Systems Corporation ("EDS") and it subsidiaries ... with a strong incentive for individual creativity and contribution to ensure the future growth of the Company. The Plan is not designed to benefit persons who may be satisfied solely with past accomplishments but, rather, is designed to reward those who are deeply committed to a career with the Company and whose ability and diligence permit such persons to make impor-tant contributions to the success of the Company...."

**5.** For similar reasons, I will not grant defendants' request to accept into evidence an oral conversation between defendants' counsel and Cattin. Allegedly, the consequences of Cattin's leaving EDS before reaching age fifty-five were discussed.

**6.** *See* footnote 1 *supra.*