Oscar LAFIAN, Plaintiff,

v.

**ELECTRONIC DATA SYSTEMS COR-PORATION, and General Motors Corporation, Defendants.**

No. 93–CV–71773–DT.

United States District Court, E.D. Michigan, Southern Division.

June 24, 1994.

Jules B. Olsman, Royal Oak, MI, for plaintiff.

David M. Davis, Birmingham, MI, for Gen. Motors Corp.

Terrance V. Page, Birmingham, MI, for Electronic Data Systems Corp.

*OPINION AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

### I. *INTRODUCTION*

On April 28, 1993, Plaintiff, Oscar Lafian, initiated this action by filing a five-count complaint against Defendants General Motors Corporation ("GM") and Electronic Data Systems Corporation. ("EDS"). In Count I, Plaintiff seeks a declaration that he is entitled under ERISA § 502, 29 U.S.C. § 1132, to receive special recognition stock from Defendants. Count II sets out class action allegations, and asks this Court to certify a class of "[p]ersons employed by GM prior to January 1, 1985, who 'transitioned' to EDS

on January 1, 1985, who have subsequently retired from EDS but not received the grant of Special Recognition Stock promised by GM and EDS in November of 1984." Count III alleges that Defendants breached a contract with Plaintiff to provide him with the special recognition stock. Court IV asserts that Defendant EDS committed fraud by telling Plaintiff just before he retired from EDS on May 1, 1990, that he had no right to the stock as it was a one-time offer which Plaintiff had not accepted. Lastly, Count V alleges that EDS breached its fiduciary duties under ERISA §§ 404 and 405, 29 U.S.C. §§ 1104 and 1105, by not informing him that he was entitled to the special recognition stock.

On October 29, 1993, Defendants filed a motion for summary judgment on all counts. Plaintiff responded on November 19, and filed its own motion for partial summary judgment that same day. Defendants replied to Plaintiff's response and to Plaintiff's motion on December 16.[1] Defendants also filed a supplemental brief in support of their motion on April 4, 1994.

After reviewing the papers filed by the parties and after hearing oral argument from counsel on June 2, 1994, the Court is now prepared to rule on the pending motions. This memorandum opinion and order sets forth that ruling.

## II. *FACTUAL BACKGROUND*

The facts of this case are virtually undisputed. On October 18, 1984, GM acquired EDS. Pursuant to this purchase, GM ordered the transfer of its 7,000 data processing employees to EDS. As a sweetener for the affected employees, GM and EDS promised on November 12, 1984, that GM employees with at least one year of service who transferred to EDS would receive a certain amount of GM Class E common stock based upon their years at GM, all at a nominal charge. Plaintiff was specifically promised the following:

EDS and GM intend to offer a "Special Recognition" grant under a new Stock In-

centive Program. * * * Under this proposed grant, you will have the opportunity to purchase 1000 shares of Class E Common Stock at a nominal price of 10 cents per share. * * * [T]his initial grant is based *primarily* in consideration of your prior service and experience with GM.

*See* Plaintiff's Dep., Ex. 1. (November 12, 1984 letter from EDS to Plaintiff) (emphasis in original). Plaintiff and other GM employees transferred to EDS on January 1, 1985.

On February 15, 1985, Defendants formally offered the stock to EDS employees who had transferred from GM. The stock program document states that the program is being offered "[i]n recognition of your prior valuable service and experience with [GM] and your *importance to the success of the new alliance between* [EDS] and GM...." Defendants' Brief, Ex. I, p. 1. There is also evidence, however, that at least part of the intent behind the stock grant was to make up for certain retirement benefits, discussed below, which were lost by GM employees who transferred to EDS. *See* Plaintiff's Response Brief, Ex. 7 (statement by GM Chairman Roger Smith at May 25, 1990 shareholder meeting that employees who transferred "were given stock in a value to make up for the difference in the retirement programs").

The February 15, 1985 stock program document went on to explain how the program would work. At the time of the offering, an eligible employee was to pay $.10 a share for the number of Class E common stock shares which he was offered. Although the stock was placed in the employee's name upon purchase, he would not have complete control over the stock immediately. Instead, he would gain such control over installments of the stock pursuant to a vesting schedule running from January 15, 1986, until January 15, 1995. Once a portion of the stock in the employee's name became vested, he was entitled to receive the stock certificates upon written request to EDS. However, even after some of the employee's stock had vested and he had acquired certificates for it, he faced a further restriction in that he could

---

1. On January 25, 1994, this Court dismissed the pending motions without prejudice pending the close of discovery. Defendants resubmitted their motion on January 31, the discovery cutoff date. Plaintiff did not resubmit his motion, but out of fairness the Court will consider it in any case.

only sell a percentage of the vested shares in the period following vesting. *See* Defendants' Brief, Ex. I, pp. 2–3. The employee would also have to pay withholding taxes on the stock as it vested. *Id.* at 6.

The stock program did envision the possibility that an eligible employee would retire prior to the last vesting date, and it set forth these rules regarding such an occurrence:

4.f. If Buyer's employment with the Company is terminated prior to the close of business on the last Vesting Date because of death, Total Disability, or Normal Retirement, the restrictions imposed and still existing upon any and all shares of Unvested Stock shall lapse or be removed in accordance with the vesting schedule specified herein or as determined at such time in the sole discretion of the Committee.[2]

4.g. If Buyer's employment with the Company is terminated prior to the close of business on the last Vesting Date because of Early Retirement, then at the option of the Committee: (i) GM or EDS may repurchase such of the shares of Unvested Stock at the Buyer's original purchase price as the Committee shall determine at such time in its sole discretion; or (ii) the other restrictions imposed and still existing upon any or all shares of Unvested Stock shall lapse or shall be removed in accordance with the vesting schedule specified herein or as shall be determined at such time in the sole discretion of the Committee.

Defendants' Brief, Ex. I, p. 4.

The catch to the stock program was that in the February, 1985 formal offer of the stock, Defendants for the first time conditioned the deal on the individual employee's release of any and all claims against them based upon the 1985 transfer. *See* Defendants' Brief, Ex. I, p. 5. Plaintiff, and others, refused to accept the stock offer at least in part because of this condition. Plaintiff's Dep. 64–67.[3]

A number of lawsuits—fought by the same lawyers on both sides as in the instant action—were filed against GM and EDS as a result of the 1985 transfer. The first, *Cattin v. General Motors Corp.*, was originally filed on November 19, 1984. Judge John Feikens of this bench presided over the case at the district level, and the Sixth Circuit ultimately affirmed his numerous rulings. *See* 641 F.Supp. 591 (E.D.Mich.1986), *aff'd,* 955 F.2d 416 (6th Cir.1992).

The initial complaint in *Cattin* was brought by two name plaintiffs on behalf of a class of similarly situated EDS employees. Plaintiffs alleged that Defendants violated the ERISA rights of transferring employees with less than thirty years of GM experience because, as EDS employees, they would no longer be able to accrue GM credit towards participation in GM's "thirty years-and-out" early retirement program. On May 2, 1985, plaintiffs in *Cattin* amended their complaint to include a breach of contract claim arising from the change in the special recognition stock promise from November, 1984, when Defendants failed to mention any release, and February, 1985, when Defendants made a release part of the offer. *See* Defendants' Brief, Ex. A. In the amended complaint, plaintiff sought for the first time to represent a class of persons adversely affected by the change in Defendants' stock promise.

On October 31, 1985, Judge Feikens denied plaintiff's motion for class certification of EDS employees who were allegedly injured by Defendants' retirement benefit and special recognition stock decisions. *See* Defendants' Brief, Ex. B. Judge Feikens went on to hold on August 8, 1986, that plaintiffs had no right to GM's thirty-and-out benefit under either ERISA or contract law. 641 F.Supp. at 595–96. He also ruled that while plaintiffs did not have a contract right to the unconditioned stock promise made prior to the transfer, equitable principles nonetheless dictated

---

**2.** The GM/EDS stock program was administered by the 1984 Stock Incentive Plan Committee. *See* Defendants' Brief, Ex. I, p. 2.

**3.** Defendants argue that this testimony should be discounted because it was brought out through leading questions of Plaintiff's counsel after

Plaintiff failed to identify the release as one of the reasons that he failed to participate in the special recognition stock program. However, the testimony did come out in Plaintiff's deposition, and this Court must consider it.

that they receive the stock in accord with that promise. 641 F.Supp. at 596–98.

Both parties appealed.[4] The Sixth Circuit affirmed, but on different grounds. First, the Sixth Circuit noted that the thirty-and-out claim was moot at the time of the appeal because Defendants agreed to extend that benefit to EDS employees who had transferred from GM. 955 F.2d at 422. The court then dismissed plaintiff's claim that Defendants violated ERISA § 204(g), 29 U.S.C. § 1054(g), by refusing to provide social security supplements to transferring employees that would have been available had they stayed at GM. The court found that social security supplements were not among the accrued early retirement benefits protected from erosion by that ERISA provision. 955 F.2d at 422–24. The court went on to hold that plaintiffs had no contractual right to the social security supplements. 955 F.2d at 425–26. Finally, the court held that plaintiffs were entitled to participate in the stock plan because Defendants made a unilateral contract with them to provide the stock upon their transfer. Once the plaintiffs accepted the offer by transferring, Defendants could not change the promise to include a release of claims. 955 F.2d at 427–31.

There were two other actions filed by transferring EDS employees. In *Malzahn v. General Motors Corp.*, filed on October 30, 1986, before Judge Stewart Newblatt of this bench, plaintiff asserted claims for the special recognition stock as sought in *Cattin.* Plaintiff in *Malzahn* similarly petitioned to represent a class of EDS employees who refused to sign the release in order to get the stock. *See* Defendants' Brief, Ex. C (*Malzahn* Complaint, Count III, ¶ 3).

It is unclear from the record evidence before this Court regarding *Malzahn* whether plaintiff in that action abandoned the stock grant class that it initially sought to represent in favor of a retirement benefit class. *See* Defendants' Brief, Ex. D (December 8, 1987 motion to allow filing of a first amended complaint for the purpose of redefining members of the class); Ex. E (stipulation and order permitting amendment). In any case, it appears that Judge Newblatt ruled on the identical retirement benefit and stock grant claims brought before Judge Feikens. Judge Newblatt similarly dismissed plaintiff's retirement claims and found for plaintiff on her stock claims, although he did so on a breach of contract theory rather than on equitable principles. *See* Plaintiff's Response Brief, Ex. 4 (June 11, 1990 opinion and order). This decision was summarily affirmed by the Sixth Circuit, which found *Cattin* controlling on the issues presented. *See id.* Ex. 3.

Following Judge Newblatt's June 11, 1990 decision, plaintiff in *Malzahn* sought to certify a stock grant class. Judge Newblatt denied this motion on February 6, 1991, on two grounds. First, he believed that plaintiff had abandoned her stock grant class allegations when she amended her complaint to state a retirement benefits class. Second, he held that it would be unfair to permit plaintiff to wait until after she had received a favorable ruling on the merits to move to certify a class. *See* Defendants' Brief, Ex. F (February 6, 1991 opinion and order).

---

4. *Cattin* had a difficult journey between Judge Feikens' August 8, 1986 decision and the Sixth Circuit's affirmation of that ruling on January 30, 1992. Judge Feikens entered judgment consistent with his August 8, 1986 opinion on October 22, 1986. Both sides filed timely notices of appeal. On November 25, 1986, plaintiffs moved for relief from judgment under Fed.R.Civ.P. 60(b) on the ground that GM's amendments to its retirement plan violated the recently amended ERISA § 204(g), 29 U.S.C. § 1054(g) (and the analogous provision in the Tax Code, I.R.C. § 411(d)(6)). Judge Feikens denied the motion on the ground that he no longer had jurisdiction over the case because the cross-appeals were already docketed.

On August 5, 1987, the Internal Revenue Service got into the fray by reopening its investigation of the amendments of GM's retirement plan to see if they complied with I.R.C. § 411(d)(6). As a result, the Sixth Circuit remanded *Cattin* to Judge Feikens for reconsideration once the I.R.S. issued a final decision.

On July 18, 1989, the I.R.S. issued a determination that the GM amendments to its retirement plan complied with I.R.C. § 411(d)(6). Judge Feikens then re-affirmed his August 8, 1986 decision, and he re-entered judgment consistent therewith on November 21, 1989. The cross-appeals, at that point, were finally ready to be heard.

The final action involving the same set of facts was *Munday v. Electronic Data Sys. Corp.*, filed in Wayne County Circuit Court on February 14, 1991. In this complaint, over a dozen name plaintiffs sought certification of a class of "individuals who were advised that they would receive stock effective as of the time of their transfer to EDS on January 1, 1985, but who refused to sign the grant of stock because it contained the release clause applicable to related claims." *See* Defendants' Brief, Ex. G, Count I, ¶ 16(b). This Court is unaware of what happened to this action, other than that the alleged class was not certified because plaintiffs failed to timely move for certification. *See* M.C.R. 3.501(B)(1)(a); M.C.R. 3.501(B)(2).

According to his uncontradicted deposition testimony, Plaintiff in the instant action was largely oblivious to the swirl of litigation going on around him. He did testify that in late 1985 he asked his supervisor, Phil Shelly, to look into the possibility of his participating in the stock grant program. In early 1986, Plaintiff followed up on his request, and Mr. Shelly told him that the matter was being litigated. Plaintiff's Dep. 38–40. Plaintiff repeatedly checked with Mr. Shelly on the status of the litigation, until sometime in 1988 Mr. Shelly told him something along the lines of: "The litigation is over, and nothing came of it." *Id.* at 42–44. Plaintiff testified: "I thought it was a dead issue then." *Id.* at 44.

Plaintiff brought up the stock grant program two more times within the last year before he retired in May, 1990. Sometime in 1989 he asked his last supervisor, Gail Webster, about getting the stock grant. He was told: "That was a one-time offer, that's a one-time deal, that's all." Plaintiff's Dep. 45. Ms. Webster did not mention anything about any pending litigation. Plaintiff also spoke with Judy Tinor of GM about the stock grant and other benefits. Plaintiff testified that Ms. Tinor did not respond to his request on the stock grant, and he did not pursue the matter. *Id.* at 52–53.

**5.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out

## III. ANALYSIS

### A. THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 2552, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, hav-

frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright et al., *Federal Practice & Procedure*, § 2727, at 35 (Supp.1994).

ing had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * * [*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in deciding the cross-motions for summary judgment.

## B. THE GM/EDS STOCK PROGRAM IS NOT AN ERISA PENSION PLAN.

In preparing for the hearing on these motions, the Court came to the conclusion that the threshold issue in this case was whether or not the 1985 stock program was a "pension plan" within the meaning given that term by ERISA.[6] The answer to this question is extremely important; if the answer is no, then there is no federal subject matter jurisdiction over Plaintiff's claims that he is entitled to participation in the stock program because those claims would no longer implicate ERISA.

Defendants contend that the stock program is not an ERISA pension plan, and they have cited a regulation and case law in support of their position. Plaintiff argues that the stock program is a pension plan

because it would provide income after retirement in at least Plaintiff's case, and because the stock program was offered as a substitute for lost retirement benefits.

After careful review of the record and the law, the Court holds that the GM/EDS special recognition stock program is not an ERISA pension plan. The Court has reached this conclusion for two reasons. First, heretofore all of the courts whose decisions this Court has reviewed that have determined whether EDS employees who transferred from GM are entitled to participate in the special recognition stock program without the release of claims provision have based their decision on state law grounds. See Cattin, Malzahn. Although it does not appear that the issue of whether the stock program was an ERISA pension plan was ever actually litigated in these decisions, the fact that Judge Feikens, Judge Newblatt and a panel of the Sixth Circuit have resolved the dispute over the stock grant on state law grounds is at least corroborative of a finding that the stock program is not an ERISA plan.

More importantly, the Court bases its conclusion on the fact that the ERISA statute, its regulations and surrounding case law indicate that plans such as the one in this case are not ERISA pension plans.

The statute itself defines ERISA pension plans with the following language:

[T]he terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

---

6. Plaintiff has never argued or even suggested that the stock program was an employee welfare

benefit plan as defined by ERISA § 3(1), 29 U.S.C. § 1002(1).

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). The applicable regulation states:

> **Bonus program.** For purposes of title I of the Act and this chapter, the terms "employee pension benefit plan" and "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to termination of covered employment or beyond, or so as to provide retirement income to employees.

29 C.F.R. § 2510.3–2(c).

These provisions on their face, then, establish that the GM/EDS stock program is not an ERISA pension plan if it is a bonus program that was not specifically designed to provide retirement income and that does not systematically defer income past termination of employment.

The Court believes that all of these conditions have been met. The stock program is certainly a bonus plan, in that it was clearly offered as a sweetener for GM employees who were transferring to EDS. Moreover, the program's own terms state that the grant was made in recognition of past service and in order to encourage new EDS employees, thus further suggesting the bonus nature of the grant.

That the stock program may have been designed to make up for lost retirement benefits as a result of the transfer is irrelevant to a determination of whether the stock grant is a bonus or not. If Plaintiff was entitled to those retirement benefits, he would have a cause of action for their denial regardless of what replaced them (although there may be possible setoffs). The stock grant in this case was still a benefit that Defendants were under no obligation to offer, but that they did offer in order to boost the morale of a class of employees.

It is equally clear to the Court that the stock program was not designed to provide retirement income, and that it does not sys-

tematically defer income past an employee's retirement or termination. Under the terms of the program, the employees were owners of the stock as of February, 1985. Although their rights to the stock were restricted by the vesting schedule and selling rules, employees would begin to realize the benefits of their stock within a little over one year of their transfer. Furthermore, employees might realize all of the benefits of the stock if they stayed with EDS past the last vesting date. While some employees, like Plaintiff, would retire before the vesting schedule ended, and while the program had procedures to deal with such instances, the Court does not believe that these circumstances change the fact that the program, as a whole, largely provided for additional income to employees during the course of their employment.

Moreover, just because the GM/EDS stock program was enacted to replace retirement benefits does not mean it provides retirement income. Rather, an independent review of the stock program in this case demonstrates that the stock program's provision of any retirement income to certain employees is merely the result of those employees' individual circumstances. In other words, there is simply no clear intent in the stock program to provide retirement benefits or to systematically defer income until after retirement or other termination.

The case law interpreting ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and 29 C.F.R. § 2510.3–2(c) support the Court's analysis. The leading case in this area is *Murphy v. Inexco Oil Co.,* 611 F.2d 570 (5th Cir.1980). In *Murphy,* the Fifth Circuit held that a bonus program whereby certain qualifying employees would receive royalties on proceeds from particular oil drilling projects was not an ERISA plan, even though those royalties would extend after the employee retired. The court ruled that the words "provides retirement income" in ERISA § 3(2)(A) "patently refer only to plans *designed for the purpose of paying retirement income* whether as a result of their express terms or surrounding circumstances." 611 F.2d at 575 (emphasis added). The court also ruled:

Neither has it been shown that the Westland Agreement is a plan "that results in a deferral of income." The record before us does not establish that any deferral of income ensues from the plan; royalty is paid to the employee annually as it is received. It is an inherent characteristic of the royalty interest that it is paid on oil or gas production whenever that is realized. *Under the statutory definition, therefore, the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage.*

611 F.2d at 575 (emphasis added).

The court went on to apply 29 C.F.R. § 2510.3–2(c) to the royalty agreement. Finding that the royalty was clearly a bonus for excellent service, the court added:

> The regulation does interpret ERISA as applicable to some bonus plans, but only those whose payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement benefits. The Westland Agreement provides for benefits to be paid immediately to employees, not for their deferment in any fashion, systematic or otherwise; it was evidently designed to provide current rather than retirement income to Inexco's employees. Inexco rewarded its employees for their work with a bonus consisting of a royalty right. Some of the proceeds of this right might be paid to an employee after he had retired or otherwise left Inexco, or even to his heirs after his death, but this arose out of the inherent characteristic of the property to pay the bonus. Save for its non-assignability, the full economic benefit of the bonus accrued from the time production began. The import of the regulations, therefore, is to exempt the Westland Agreement from ERISA coverage.

611 F.2d at 575–76 (footnote omitted).

The court noted, finally, that:

> Looking more widely to the purposes of the statute, we consider the vesting, funding, and insurance provisions of ERISA inapplicable to plans like the Westland Agreement. The contributions are made currently. There are no promises of future commitments. Westland pays out of its total receipts; there is no investment or reinvestment of proceeds. Insurance of future benefits would be inappropriate.

611 F.2d at 576.

*Murphy* is important because it makes clear that only programs *designed* to provide retirement income fall with the first prong of the statutory definition of pension plans. Thus, a bonus program, like the one in *Murphy* and the instant case, which is created to provide current income and only incidentally provides benefits after retirement is not an ERISA pension plan "provid[ing] retirement income to employees." 29 U.S.C. § 1002(2)(A)(i).

In light of *Murphy,* if the Court is to find GM/EDS stock program to be an ERISA pension plan, it can only be because the program has an income deferral mechanism. Two district court decisions, however, have built on *Murphy* to hold that bonus stock plans similar to the one in the case at bar are not covered by ERISA.

The first of these opinions is *Foltz v. U.S. News & World Report, Inc.,* 627 F.Supp. 1143 (D.D.C.1986) (Parker, J.). In that case, the court specifically ruled that a stock bonus plan in which the stock was not redeemable until retirement or separation nonetheless fell outside of ERISA. The court stressed the language in 29 C.F.R. § 2510.3–2(c) that ERISA pension plans did not include bonus payments "unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 627 F.Supp. at 1164. It then went on to state:

> In support of their argument that the stock bonus plan is covered by ERISA, plaintiffs assert that the U.S. News plan *does* defer the income to its employees and that such deferral is effected by the requirement that the bonus stock be redeemed only upon retirement or separation. In response, defendants argue first that, since the stock awards were made to employees at regular intervals and were based upon services rendered by the employees, they were essentially current com-

pensation and, hence, not the kind of deferred or retirement income contemplated by ERISA. In support of that proposition, defendants cite *Murphy v. Inexco Oil Co.,* 611 F.2d 570, 575 (5th Cir.1980), a case involving a plan in which employees received discretionary awards of royalties from the employer's oil and gas revenues. In holding that the royalties were not pension benefits, the *Inexco* court stressed that payments were made annually to the employees as the company received revenues. 611 F.2d at 575. The difference between that plan and the U.S. News plan, of course, is that U.S. News paid its employees in *stock* redeemable only upon separation. *But cf. Jervis v. Elerding,* 504 F.Supp. 606 (C.D.Cal.1980) (in-kind payments not covered by ERISA).

In arguing that the resale restrictions placed on the bonus stock are not sufficient to qualify the plan for ERISA coverage, defendants note that the stock awards were taxable to the employees upon receipt. Hence, they contend the awards could not have been a form of deferred compensation. Whether the tax treatment of the plan is controlling is unclear, but defendants urge the court's reliance upon it in the absence of other controlling precedent.

\* \* \* \* \* \*

From the analysis of the authorities advanced by the parties and after consideration of the statutory definitions and regulations, the Court accepts defendants' position that the stock bonus plan is not covered by ERISA.

627 F.Supp. at 1164–65 (emphasis in original).

The Court finds *Foltz* persuasive authority for its holding that the GM/EDS stock program does not defer income so as to make it an ERISA pension plan. *Foltz* held that there was no systematic deferral of income to or beyond termination in the U.S. News plan, even though the employees could redeem the stock only upon separation from the company. In reaching its decision, the *Foltz* court found it important that the stock accrued to the employees while they were still on the job and that the employees paid income taxes

on it as it accrued. These same facts are present with respect to the GM/EDS stock program, and, in addition, under that program affected EDS employees begin to see the fruits of their bonus prior to separation. In other words, if the *Foltz* plan is not a pension plan, the Court does not see how it can hold the GM/EDS program to be one.

Finally, in *Johnson v. TCOM Sys., Inc.,* 1989 U.S.Dist. LEXIS 15723 (D.D.C.1989) (Lamberth, J.), the court held that a stock program even more analogous to the GM/EDS offering was not an ERISA pension plan. In that case, plaintiff was a former chief executive of defendant who was discharged. Plaintiff brought, *inter alia,* ERISA claims against defendant, and one of his arguments that his benefits constituted an ERISA plan was that the company had a stock program with a vesting schedule. The *Johnson* court denied that the stock program constituted an ERISA plan with the following analysis:

> The plaintiff also claims that ERISA protections flow from Johnson's Amended and Restated Stock Restriction Agreement, which gives Johnson the right to vest in additional shares of TCOM stock at certain times, and provides TCOM with the option of purchasing, at certain prices depending on the duration of Johnson's employment and the conditions of his termination, unvested TCOM stock at the time of termination. Johnson claims that because his right to vest in additional shares of stock was contingent on his continued employment that [the stock agreement] met the requirements of 29 U.S.C. § 1002(2)(A), which defines employee pension benefit plans. However, the regulations and a case from this Court make it clear that
>
> > "employee benefit plan" and "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.
>
> 29 C.F.R. § 2510.3–2(c) (1984) (emphasis added), cited in *Foltz v. U.S. News &*

348

*World Report, Inc.*, 627 F.Supp. 1143, 1164 (D.D.C.1986) (holding that resale restrictions on bonus stock not sufficient to qualify the plan for ERISA coverage).

Under Johnson's Amended and Restated Stock Restriction Agreement, shares owned by Johnson as of May 8, 1987, did become "vested" on a schedule of certain percentages on certain dates. However, Johnson's right to sell his shares was not "systematically deferred to the termination of covered employment." Johnson's vested shares could be sold at any time subject to the restrictions of paras. 2 and 3 of the Amended and Restated Stock Restriction Agreement, which gave TCOM a first right of refusal. Only unvested shares had to be held by Johnson until termination, at which time TCOM's option under para. 1 was in effect. Johnson's unvested shares could become vested under the schedule of para. 1 which related to the duration of employment, but also could become vested in the event of the death of the stockholder, the disability of the stockholder, the merger of the corporation, or the public offering of the stock of the corporation. In sum, Johnson's stock bonus plan was one where, on an annual basis and at the occurrence of other specified events, Johnson was free to sell an increasing quantity or all of his stock subject to TCOM's Restriction Agreement. This plan does not track the definition of ERISA employee pension benefit plan under the regulations and, so, is not subject to ERISA's provisions. 1989 U.S.Dist. LEXIS 15723, 8–11.

*Johnson* further supports the Court's contention that ERISA's definition of pension plans does not envision stock programs such as the one Defendants established in this case. *Johnson* is significant in that it holds that even if a stock program like the GM/EDS offering has a vesting schedule which may extend to termination (or beyond), it is still not a pension plan.

*Murphy*, *Foltz*, and *Johnson*, then, when read in the context of the statute, the applicable regulation, and the way in which other courts have handled the GM/EDS stock program, convince the Court that that program is not an ERISA pension plan. Because of this holding, the Court must dismiss Plaintiff's ERISA counts for failure to state a claim upon which relief can be granted. As for the state law claims for breach of contract and misrepresentation, the Court chooses not to maintain pendent jurisdiction. *See* 28 U.S.C. § 1367(c)(3). *See also United Mine Works v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); 13B Charles A. Wright et al., *Federal Practice & Procedure* § 3567.1 (West 1984 & Supp. 1994).

## IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Count I and V of Plaintiff's complaint be DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the balance of the complaint be DISMISSED WITHOUT PREJUDICE, and that the limitation period for filing these claims shall be tolled for the duration of this action, plus 30 days.