**J. P. MURPHY, Plaintiff-Appellant,**

v.

**INEXCO OIL COMPANY et al., Defendants-Appellees.**

**J. P. MURPHY, Plaintiff-Appellant,**

v.

**INEXCO OIL COMPANY et al., Defendants-Appellees.**

Nos. 77–1689, 77–3254.

United States Court of Appeals, Fifth Circuit.

Feb. 8, 1980.

Sam E. Rowland, Houston, Tex., for plaintiff-appellant.

Frank J. Knapp, Houston, Tex., for Inexco, Westland, August, Tinker & Gill.

Fletcher Etheridge, Arthur S. Berner, Houston, Tex., for Wolf, Land, Wolf & Goodwin.

Before FAY, RUBIN and HATCHETT, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

An employee's claim that a bonus plan created by his employer violated the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1381 (ERISA), was dismissed for want of jurisdiction on the basis that the plan was not within the coverage of ERISA. Because a federal court has jurisdiction to decide whether a claim to ERISA coverage has merit, we reverse the dismissal. However, because the question of ERISA coverage was fully briefed and argued and will doubtless be of key importance in future proceedings, we consider that issue.

## I.

Murphy was formerly president of Inexco. While he was a corporate officer, Inexco gave bonuses to selected employees by assigning a specific royalty interest in a drilling prospect[1] it planned to develop to Westland Royalty Company. Westland would administer that interest for the benefit of the designated employee in accordance with a plan called the Westland Royalty Participation Agreement (Westland Agreement). Under the Westland Agreement, each employee was given "participation units," i. e. rights to receive a fractional portion of any proceeds that might thereafter accrue from the designated project, not from Westland's revenue as a whole.

Royalty payments were made to Westland from production proceeds, not from the employer's funds. Westland in turn

---

1. A "prospect" is defined in the Westland Agreement as a composite block of mineral leases and mineral interests grouped as a unit for purposes of evaluation, sale or development.

paid each participant his share of the oil and gas proceeds annually. Westland held legal title to the royalty interests, but economically this arrangement was the same as though the employees had themselves been given undivided fractional shares in the royalty accompanied by the same restrictions that accompanied the participation units.[2]

The assignment of an interest in a prospect was discretionary, based on management's assessment of an employee's contribution to the company, with consideration being given to his length of service and job classification. After the end of a person's employment with the company, by retirement or otherwise, Inexco no longer assigned new participation units to him, but he continued to own those participation units representing interests that had already been assigned.[3]

Murphy contends that Inexco diverted money from Westland and violated ERISA reporting requirements, contract provisions concerning consent of the participants to changes in the plan, various unspecified provisions of ERISA and ERISA's predecessor, the Welfare and Pension Plans Disclosure Act, 29 U.S.C. §§ 301–309 (repealed), and its fiduciary duties imposed by state law.

## II.

■ Federal question jurisdiction is predicated upon the assertion of a claim arising under the constitution or laws of the United States. 28 U.S.C. § 1331. However, the assertion that the claim involves such a question must be more than incantation. While jurisdiction does not depend on the contention having ultimate merit, its mere recital cannot confer jurisdiction if the contention is frivolous or patently without merit. *Mindes v. Seaman,* 453 F.2d 197, 198 (5th Cir. 1971); 13 C. Wright, A. Miller & E.

Cooper, Federal Practice and Procedure § 3564, at 429–30 (1975). The same criterion applies when jurisdiction is asserted by a claim to ERISA coverage. Here jurisdiction was invoked on the basis that the case involved a federal question, 28 U.S.C. § 1331, and ERISA, 29 U.S.C. § 1132(e). Because Murphy's assertions were not frivolous, the district court had subject matter jurisdiction.

■ Once jurisdiction is established, the merit of a claim may be tested at the pleading stage by a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). *Mindes v. Seaman,* 453 F.2d 197, 198 (5th Cir. 1971). No such motion was filed, and we cannot consider Inexco's allegation of want of jurisdiction as its equivalent because it was not measured against the bare allegations of the complaint. Instead, the district judge based his disposition in part on the consideration of matters in addition to the complaint, including the defendants' affidavit and accompanying exhibit. The only way to test the merit of a claim if matters outside the bounds of the complaint must be considered is by way of motion for summary judgment. In that event, even if a motion to dismiss has been filed, the court must convert it into a summary judgment proceeding and afford the plaintiff a reasonable opportunity to present all material made pertinent to a summary judgment motion by Fed.R.Civ.P. 56. *Arrington v. City of Fairfield,* 414 F.2d 687 (5th Cir. 1969); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1366, at 679 (1969). This was not done, and from the record we cannot say beyond peradventure that there is nothing the plaintiff could adduce that would create a genuine issue of material fact. Therefore, we must remand the case for further proceedings.

---

**2.** The participation units can be mortgaged or otherwise encumbered, but are not freely assignable. A royalty right conveyed directly to the employee might be similarly restricted.

**3.** If his departure from the company was for reasons other than death, disability, or company-authorized retirement, he was divested of

his participation units. These units were then in effect allotted to other employees according to their share in that prospect; if some units were eliminated, the percentage of the revenues from the prospect attributable to each remaining unit would increase.

## III.

■ Because the district court must now consider Murphy's claim to ERISA coverage, an issue that was the basis of the trial court's opinion, has been fully briefed in this court, and, after a wait of two years for a hearing on our crowded docket, argued and submitted, sound judicial administration requires us to discuss the merits of that claim. *See United States v. Daniels,* 572 F.2d 535, 539 (5th Cir. 1978); *Mindes v. Seaman,* 453 F.2d 197, 198–99 (5th Cir. 1971). We conclude that, unless Murphy can adduce evidence not now before us that would either require a different result or create a genuine issue of material fact, the Westland Agreement is not an ERISA plan.

As the plan is portrayed in the evidence now before us, contributions to the plan are bonuses; they are discretionary, given in recognition of special service and awarded in addition to regular compensation. Payments to an employee start in the year in which a given prospect begins to produce, a time when the employee ordinarily is in active service with the company, and continue so long as there is production. Therefore, while the primary thrust of the plan is to reward employees during their active years, payments to some employees or their heirs are likely to continue after the employee has retired or ceased work because of death or disability.

Congressional findings and declaration of policy that support the enactment of ERISA are set forth in the first substantial section of the statute. 29 U.S.C. § 1001. Congress found, inter alia, that there was a lack of employee information and of safeguards concerning the operation of employee benefit plans; that many employees with long years of employment were losing anticipated retirement benefits owing to the lack of vesting provisions in such plans; that, owing to the inadequacy of minimum standards for plan operation, the plans might lack funds to pay promised benefits; and that plans might be terminated before necessary funds had been accumulated, depriving employees of promised benefits. ERISA was enacted to "assur[e] the equita-ble character of such plans and their financial soundness." 29 U.S.C. § 1001(a). The statute attempts to accomplish this by requiring financial disclosure to plan participants, establishing standards of conduct for plan fiduciaries, and by requiring plans to vest accrued benefits to employees with significant periods of service, to meet minimum standards of funding and to maintain plan termination insurance. *See* 29 U.S.C. §§ 1001(b)–(c).

Congress did not, however, attempt to control every aspect of the employer-employee relationship or every promise made to employees. It sought only to deal with those types of plans that had created the problems it sought to remedy. Thus, by its terms, ERISA applies only to "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both." 29 U.S.C. § 1002(3). Together these are referred to by the single term "employee benefit plan." *Id.* To establish statutory coverage, Murphy contends that the Westland Agreement is both an employee welfare benefit plan and an employee pension benefit plan.

■ An employee welfare benefit plan is defined in the statute as any plan "to the extent [it] was established or is maintained *for the purpose of* providing" medical, unemployment, disability, death, vacation and other specified benefits. 29 U.S.C. § 1002(1) (emphasis supplied). However, merely because the Westland Agreement may in some circumstances continue to pay royalty proceeds after an employee's death or disability does not make it a welfare benefit plan. The statute does not embrace all plans that may incidentally result in the payment of benefits after death or disability but only plans established for the purpose of providing those benefits. It is evident that the primary purpose of the Westland Agreement was to reward employees for their service with present benefits. It was merely an incident of the vesting of economic benefits that participation continued so long as production lasts and so may result in payments after death or disability. The Westland Agreement was patently not established or maintained for that purpose.

■ The words used in the definition of an employee pension benefit plan are broader. An employee pension benefit plan is defined by 29 U.S.C. § 1002(2) as any program or plan "to the extent that by its express terms or as a result of surrounding circumstances" it:

(A) provides retirement income to employees, or

(B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

This definition is not algorithmic. However, when applied to the type of plan embodied in the Westland Agreement, its intent appears to be clear. Its words are not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach. Any outright conveyance of property to an employee might result in some payment to him after retirement. The words "provides retirement income" patently refer only to plans designed for the purpose of paying retirement income whether as a result of their express terms or surrounding circumstances.

Neither has it been shown that the Westland Agreement is a plan that "results in a deferral of income." The record before us does not establish that any deferral of income ensues from the plan; royalty is paid to the employee annually as it is received. It is an inherent characteristic of the royalty interest that it is paid on oil or gas production whenever that is realized. Under the statutory definition, therefore, the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage.

Pursuing the familiar path of investigating legislative history does not bring us into different terrain. While various portions of the statute were discussed at length during the legislative process, we have found no discussion of this section and no elaboration of the Congressional intention embodied in it. Our next recourse, therefore, is to the interpretation adopted by the Secretary of Labor in the regulations promulgated under the authority given him by the statute, 29 U.S.C. § 1135. "[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ." *Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1969).

Although over five years have elapsed since the statute was enacted, the regulations still do not fully clarify the scope of ERISA. Goodman and Stone, Exempt Compensation Arrangements under ERISA, 28 Catholic U.L.Rev. 445, 451 (1979). However, the regulations do exclude from the definition of pension plan "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c) (1979).

As the Westland Agreement is portrayed in the record, it is evident that participation rights were given to employees as "bonuses for work performed." No employee regardless of his position, was guaranteed any participation rights; he was given them only according to the management's assessment of his contribution to the financial well-being of the company.

■ The regulation does interpret ERISA as applicable to some bonus plans, but only those whose payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement benefits. The Westland Agreement provides for benefits to be paid immediately to employees, not for their deferment in any fashion, systematic or otherwise; it was evidently designed to provide current rather than retirement income to

Inexco's employees. Inexco rewarded its employees for their work with a bonus consisting of a royalty right. Some of the proceeds of this right might be paid to an employee after he had retired or otherwise left Inexco, or even to his heirs after his death, but this arose out of the inherent characteristics of the property used to pay the bonus. Save for its non-assignability, the full economic benefit of the bonus accrued from the time production began. The import of regulations, therefore, is to exempt the Westland Agreement from ERISA coverage.[4]

Literal interpretation derived from parsing the language of the statute and the regulations does not result in inclusion of the Westland Agreement within ERISA. Looking more widely to the purposes of the statute, we consider the vesting, funding, and insurance provisions of ERISA inapplicable to plans like the Westland Agreement. The contributions are made currently. There are no promises of future commitments. Westland pays out its total receipts; there is no investment or reinvestment of proceeds. Insurance of future benefits would be inappropriate.

This conclusion is buttressed by the Secretary of Labor's opinion that a similar arrangement was an exempted bonus plan. *See* Department of Labor Advisory Opinion No. 77–26 A (March 4, 1977). *See generally* Goodman & Stone, Exempt Compensation Arrangements under ERISA, 28 Catholic U.L.Rev. 445 (1979).

■ Murphy's other contentions merit only brief discussion. He asserts that the Westland Agreement is a profit-sharing plan within the scope of the Welfare and Pension Plans Disclosure Act, 29 U.S.C. §§ 301–309 (repealed);[5] that ERISA subsumes the Welfare and Pension Plans Disclosure Act; and that the Westland Agreement is therefore within the scope of ERISA. The Welfare and Pension Plans Disclosure Act applied to a plan "established by an employer . . . *for the purpose of* providing . . . retirement benefits, [including] any profit-sharing plan which provides benefits at or after retirement." 29 U.S.C. § 302(a)(2) (repealed) (emphasis supplied). Even if the Westland Agreement is a profit-sharing plan, as Murphy contends, it was not established for the purpose of providing retirement benefits, although it may do so incidentally.[6]

■ Finally, Murphy argues that the Westland Agreement has been "merged" with Inexco's new pension plan, and that, because the successor plan is within ERISA, the Westland Agreement is enfolded by the Act. In support he contends that Inexco ceased to commit new royalty rights to the Westland Agreement, dedicating them instead to the new pension plan, and diverted to the new plan royalties due Westland from previously assigned interests. Proof of these contentions would not signify a merger of the plans; the pension plan would merely have replaced the Westland Agreement as a vehicle for new employee benefits. Westland continues to play its role for those bonuses conveyed to it during the term of Murphy's employment.[7]

---

4. Although they are not directly applicable to the Westland Agreement as the regulation on bonuses is, other sections of the Secretary's regulations also indicate that the bare payment of something to an employee after he has retired or otherwise left his employment does not ipso facto result in coverage. Severance pay plans are not retirement plans even though they are inevitably paid to an employee after he has left his employment. 29 C.F.R. § 2510.3–2(b) (1979). Under certain conditions gratuitous payments after retirement to employees who retired before September 2, 1974 are likewise not considered retirement plans. *Id.* § 2510.3–2(e).

5. The Welfare and Pension Plans Disclosure Act was repealed by ERISA, effective January 1, 1975. 29 U.S.C. § 1031.

6. In his complaint, Murphy alleges defendants violated the Welfare and Pension Plans Disclosure Act as well as ERISA. He does not argue the point in his briefs in this court.

7. If funds of the Westland Agreement have been improperly diverted to the new plan, there may be a cause of action under state law. However no federal basis for the claim has been shown.

We need not discuss the pendent state claims. Should the federal action be dismissed, the state courts provide ample recourse.

For the foregoing reasons, the judgment is REVERSED and the case is REMANDED to the district court for further proceedings consistent with this opinion.