INTERNATIONAL PAPER
COMPANY, Plaintiff,

v.

Mark A. SUWYN and Louisiana–Pacific
Corporation, Defendants.

No. 96 CV 0143(BDP).

United States District Court,
S.D. New York.

Sept. 24, 1997.

---

**508**

Joseph S. Allerhand, Weil, Gotshal & Manges L.L.P., New York City, for Plaintiff.

Ellen Nadler, Kramer, Levin, Naftalis & Frankel, New York City, for Defendants.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Plaintiff, International Paper Company ("International Paper"), brought this action seeking enforcement of a noncompete agreement signed by Mark A. Suwyn ("Suwyn"), a former Executive Vice President of International Paper. International Paper also asserted claims against Suwyn and Louisiana–Pacific Corporation ("Louisiana–Pacific") for breach of fiduciary duties and tortious interference with contract. Defendants, in turn, asserted a number of counterclaims seeking payments purportedly due Suwyn under various benefit and bonus plans offered by International Paper.

All claims in this action were previously tried to this Court. In an Opinion dated June 19, 1997, this Court denied plaintiff's application for injunctive relief and dismissed plaintiff's breach of fiduciary duty and tortious interference claims. *See International Paper Co. v. Suwyn,* 966 F.Supp. 246 (S.D.N.Y.1997). For the reasons stated below, defendants' counterclaims are likewise dismissed. The Court's Findings of Fact and Conclusions of Law on defendants' counterclaims follow.

## BACKGROUND

This action has been the subject of a number of prior opinions, familiarity with which is assumed. *See International Paper Co. v. Suwyn,* 951 F.Supp. 445 (S.D.N.Y.1997); *International Paper v. Suwyn,* 966 F.Supp. 246. A brief overview of the facts relevant to the counterclaims follows.

International Paper is a multinational paper and forest products company with approximately 81,500 employees. From March 1, 1992 until January 2, 1996, Suwyn was an Executive Vice President of International Paper, responsible for overseeing the company's forest products, specialty products, and distribution businesses. Before Suwyn accepted his position with International Paper, he received a letter dated January 20, 1992 ("Employment Letter") signed by John Georges, International Paper's then Chief Executive Officer and Chairman, referring to International Paper's various retirement, benefit, and incentive compensation plans. Specifically, the letter provided that (1) Suwyn's base salary would be $280,000; (2) Suwyn would be "eligible to participate" in International Paper's Management Incentive Plan ("MIP") with a "target award" of $172,000; (3) he would be "eligible to participate" in International Paper's Performance Share Awards ("PSA") program; and (4) he would receive an Executive Continuity Award ("ECA"). Shortly after Suwyn commenced his employment at International Paper, he received a binder of materials describing the company's benefit and retirement plans.

The MIP referred to in the Employment Letter is International Paper's annual incentive compensation plan, pursuant to which senior executives are awarded annual bonuses. The MIP pays those bonuses from an award fund which is based on the achievement by International Paper of certain financial and nonfinancial objectives. The funding for bonus awards for a given calendar year occurs in the following January and is based on two factors. First, the award fund is

established only if a specified level of net after-tax earnings and predetermined targets for qualitative nonfinancial performance factors, such as quality, safety, and employee development, are achieved by year end. Second, if those financial and nonfinancial targets are achieved, the amount in the award fund is calculated by aggregating target bonus levels that have been pre-established for each eligible MIP participant. The Committee then determines the bonus, if any, to be awarded to each MIP participant,[1] and bonus award packets are assembled for each participant and forwarded to senior managers for distribution to those participants on a selected date. In each year since 1992, MIP awards were made during the second week of February following the bonus award period.

The MIP explicitly provides that awards will not be paid to plan participants if "employment with the Company is terminated for reasons other than death, disability or retirement prior to actual payment of an award under this Plan." Upon receiving notification that Suwyn's employment with International Paper had terminated as of January 2, 1996, the Committee automatically removed Suwyn as an MIP bonus recipient with respect to 1995.

The LTICP [Long Term Incentive Compensation Plan], for which, according to the Employment Letter, Suwyn was eligible, authorizes grants of restricted stock, stock options, and stock appreciation rights to selected senior managers. The LTICP provides for the granting of Performance Share Awards, which are based predominantly on the performance of International Paper relative to other companies over a five-year performance award period ("Award Period"). In or around the December preceding the start of each Award Period, a target number of shares is contingently granted to each eligible employee. According to Rosemary Schmitt, who worked with the Committee in its administration of the company's executive compensation programs, if the conditions to the PSA plan and the performance goals are met as determined by the Committee in the

April following the end of the Award Period, the Committee fixes the number of previously granted "contingent" shares as "earned" by each participant. One-half of those shares become unrestricted at that time; the other half become unrestricted at the earliest of death, permanent disability, retirement after the age of 62, or the third anniversary of the date of the determination of the award.

Executive Continuity Awards, which are also authorized under the LTICP, are, according to Schmitt, "designed to motivate and reward a small select group of top International Paper executives and to align their interest with that of shareholders by directly linking their long-term compensation to an increase in [International Paper's] stock price." The ECA program contemplates tandem grants of restricted stock and stock options, each of which is evidenced by an agreement signed by the recipient ("ECA agreement"). For each share of restricted stock granted, the executive is granted an option to purchase five shares. If the executive exercises the option after a certain date—which for Suwyn was the date at which he turned 62—but before the employee attains the age of 65, and while he is an employee of International Paper, he receives the shares underlying the option free and clear. If the participating employee does not exercise the option, the shares underlying the restricted stock grant become unrestricted when the employee reaches age 65. According to Schmitt, the ECA program is a type of "golden handcuff" program which rewards executives only if they remain with International Paper over an extended time period.

During his employment at International Paper, Suwyn received two grants under the ECA program, consisting of a total tandem award of 20,000 shares of International Paper restricted stock and 100,000 International Paper stock options. Each time Suwyn received an ECA, he executed an agreement incorporating by reference the terms and provisions of the LTICP. Paragraph 4(a) of each such agreement states, in relevant part,

---

1. The MIP provides that "[t]he [Management Development and Compensation] Committee [ ("the Committee") ], in its sole discretion, may ap-

prove, revise or disapprove any recommended individual award [under the MIP] as it deems appropriate."

that "[i]f Executive ceases to be an active employee of the company prior to age 65, for any reason other than death or disability ..., all of the Restricted Shares under this Agreement shall be canceled and forfeited unless the Committee determines otherwise."

After Suwyn had accepted the position of Executive Vice President and had been working for International Paper in that capacity for over two years, Georges decided to implement a policy requiring select employees to execute a noncompete agreement ("the Noncompete"). The Noncompete, as presented for signature, would have restricted its signatories from leaving International Paper and, for eighteen months, joining any company that competed with International Paper. Suwyn initially refused to sign the Noncompete. After extensive discussions with Georges regarding the agreement's application, Suwyn signed the Noncompete and returned it to Georges with a cover letter which Suwyn claimed modified the terms of the underlying agreement.

On January 2, 1996, Suwyn tendered his resignation and joined Louisiana–Pacific as its Chairman and Chief Executive Officer. On January 10, 1996, International Paper brought this action seeking, *inter alia*, enforcement of the Noncompete. Defendants subsequently asserted a number of counterclaims seeking a declaratory judgment that (1) under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), International Paper must deliver the 20,000 restricted shares awarded under the ECA no later than the date Suwyn attains the age of 65; (2) Suwyn is entitled to recover 5,444 shares of International Paper common stock, pursuant to the PSA; (3) Suwyn is entitled to an MIP award for 1995 under three alternative theories: breach of oral contract, implied contract, and quantum meruit; and (4) Suwyn is entitled to receive his 1995 MIP bonus under Article 6 of New York Labor Law § 190. International Paper subsequently moved to dismiss all of defendants' counterclaims. This Court, upon consent of all parties, consolidated plaintiff's motion with the trial on the merits.

## DISCUSSION

### A. The Executive Continuity Awards Program

■ Suwyn seeks a declaration that the contingent restricted shares granted to him pursuant to the ECA program are due him when he attains the age of 65. While acknowledging that both the LTICP and the ECA agreements he signed contained provisions pursuant to which the awards would be forfeited if Suwyn "cease[d] to be an active employee of the Company prior to age 65," Suwyn contends that the ECA program is a "pension plan" governed by ERISA and, as such, those forfeiture provisions are void. *See* 29 U.S.C. § 1053.

ERISA defines an "employment pension plan" generally as:

> any plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program—
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.

29 U.S.C. § 1002(2)(A). Defendants contend that the ECA program qualifies as a "pension plan" under either definition.

■ When considering the first definition of "pension plan"—whether the plan "provides retirement income"—generally "only plans 'designed for the purpose of paying retirement income' should be considered to provide retirement income under ERISA." *Foster v. Bell Atlantic Tricon Leasing Corp.,* 93 Civ. 4527, 1994 WL 150830, at *3 (S.D.N.Y. Apr.20, 1994); *see, e.g., McKinsey v. Sentry Ins.,* 986 F.2d 401, 405 (10th Cir. 1993); *Murphy v. Inexco Oil Co.,* 611 F.2d 570, 575 (5th Cir.1980); *Lafian v. Electronic Data Syst. Corp.,* 856 F.Supp. 339, 345 (E.D.Mich.1994); *see also Williams v. Wright,* 927 F.2d 1540 (11th Cir.1991) ("[o]ur analysis of the arrangement at issue in the instant case will focus on whether it was designed primarily for the purpose of provid-

ing retirement income or whether [it] contemplated the payment of post-retirement income only incidentally to a contract for current employment.")

■ In determining whether a plan is a "pension plan" under ERISA, the language of the statute instructs that the "express terms or surrounding circumstances" should guide the inquiry. Thus, in addition to the express terms of the benefits plans in question, a number of key factors are pertinent to a determination of whether the purpose of the plan is to provide retirement income to employees. These factors include whether benefits are paid on a current basis before retirement age, *see Murphy,* 611 F.2d at 575, or are otherwise available periodically during the course of employment, *see Hagel v. United Land Co.,* 759 F.Supp. 1199, 1202 (E.D.Va. 1991), or whether any payments that may, in fact, be made after termination or retirement are merely incidental. *See Murphy,* 611 F.2d at 575.

The LTICP, which governs the ECA program, states that "the purpose of the [ECA] plan is to provide incentive for senior management officers and employees of the Company and its subordinates ('the Company') to improve the performance of the Company on a long-term basis, and to attract and retain in the employ of the Company persons of outstanding competence." Defendants contend that while the express purpose of the ECA program may not be to provide retirement income, viewed objectively, that is what the program, in effect, accomplishes: the restrictions on the shares of stock awarded are not removed until the participant achieves the age of 65, which, it appears, is International Paper's normal retirement age for senior executives.

I nonetheless find that the ECA program does not provide retirement income within ERISA's definitional framework. First, the program provides for current, preretirement income—the ECAs vest and become payable only if the participating executive is still employed by International Paper. While the average retirement age at International Paper may be 65, executives are free, and may very well, remain at International Paper beyond that age. Thus, some participating ex-

ecutives may enjoy the benefits of ECAs while still employed by International Paper while others may retire soon after receiving their ECA. In the absence of any evidence that the plan was designed "primarily for the purpose of providing retirement income," the plan's consequential effect of permitting some employees to enjoy after retirement the benefits of ECAs that were paid before retirement is merely incidental to the goal of providing current compensation. *Cf. Williams,* 927 F.2d at 1547 (plan was designed primarily for the purpose of providing retirement income where employer testified that it presented the plan for the purpose of procuring plaintiff's retirement and subsequently described payments under the plan as "retirement pay and not salary"); *Lafian,* 856 F.Supp. at 345 (plan found not to provide retirement income in absence of "clear intent" to do so).

As for the second definition of "pension plan," I find that the ECA program cannot be said to generally defer the receipt of income to the termination of employment and is, therefore, not an employment pension plan under ERISA. As one court has observed,

the natural reading of § 1002(2)(a)(ii)'s requirement that there be a 'deferral of income' ... to the termination of employment and beyond is that the statute requires that a plan generally defer the receipt of income to the termination of employment. The statute is not satisfied when, under the facts of a particular case, a portion of withheld income happens to become due after termination. This reading comports not only with the language, but with the general purpose of ERISA to protect employees' expectations concerning the receipt of retirement income.

*Foster,* 1994 WL 150830, at *2 (citing *Hagel v. United Land Co.,* 759 F.Supp. 1199, 1202 (E.D.Va.1991)).

First, it is noteworthy that under the ECA if a participating executive were to retire or otherwise terminate employment with International Paper prior to vesting, the restricted stock grant would be canceled immediately. Therefore, in such a case, as a technical

matter, the payment of those benefits could not be deferred to periods extending to or beyond termination but would necessarily occur before such time in order for the executive to receive any benefits at all.

Second, the program awards tandem grants of stock options and restricted stock which become unrestricted upon the recipient employee's attainment of the age of 65 or death, disability, or change in the control of the company. Under the terms of the ECA program, Suwyn could have obtained the full benefit from the ECA program by exercising the stock option portion of his award at age 62 as long as he was still employed by International Paper, and received the shares underlying the option free and clear. Thus, the ECA by operation does not require the deferral of income and, I find, any such deferral to periods extending to termination is merely incidental. *Cf. Foster*, 1994 WL 150830, at *2. Accordingly, the ECA program does not fall within ERISA's definition of "pension plan" under either 29 U.S.C. § 1002(2)(A)(i) or § 1002(2)(A)(ii). Because the terms of the ECA program provide for forfeiture of the restricted shares awarded under the program upon termination of employment, defendant's counterclaim seeking a declaration that those shares are due to him when he attains the age of 65 is dismissed.

## B. Performance Share Awards

■ Suwyn also contends that he is entitled to one-half of his PSA for the 1991–1995 Award Period, arguing that all restrictions on those shares were lifted immediately at the conclusion of that Award Period. International Paper, in turn, argues that Suwyn is not entitled his PSA for that period because he left the company before the Committee determined whether the shares would even be awarded and because the LTICP expressly provides that shares awarded under the PSA plan would be forfeited upon termination of employment.

As detailed above, the PSA program is part of, and governed by, International Paper's LTICP. Each eligible employee is contingently granted a "target" number of shares of restricted stock. At the end of a five year Award Period, the Committee determines the number of contingent performance shares that have been earned, and restrictions are removed on 50% of the earned shares. Generally, the remainder of the earned performance shares becomes unrestricted three years later. Pursuant to the LTICP, "[a]ll Performance Shares shall be subject to being forfeited and canceled by the Committee, in the Committee's discretion, if the participant terminates employment, other than by reason of death or becoming disabled or retirement after attaining age 62." In 1990, the Committee authorized management to cancel automatically all restricted shares issued under the PSA program upon an employee's voluntary termination.

The language of the plan makes clear that the PSA shares are not automatically earned at the end of the Award Period. Whether the shares awarded under the PSA plan are earned necessarily cannot be determined until sometime after the conclusion of the Award Period, because resolution of that question depends on the performance of International Paper as measured against other companies. Schmitt has averred that such assessment is not made until the April following the end of each Award Period.[2] Thus, the PSA shares that Suwyn had been contingently granted for the 1991–95 Award Period would not have become earned or unrestricted until April 1996. His intervening resignation resulted in the forfeiture of those shares. Accordingly, Suwyn's counterclaim seeking recovery of those shares is dismissed.

## C. MIP Bonus Awards

Suwyn further argues, advancing several different theories—breach of express contract, breach of implied contract, and quantum meruit—that he is entitled to an MIP award for the calendar year 1995. He also contends that his 1995 MIP bonus constituted wages recoverable under Article 6 of the New York Labor Law. International Paper contends that Suwyn is not entitled to this

---

**2.** Indeed, this understanding of the PSA plan was apparently shared by Suwyn, who, in his discussions with the executive search firm SpencerSt-uart and Louisiana Pacific, explained that "the award in 4/96 will be 50%" of the 1991–1995 PSA.

bonus because the MIP states that an employee is not entitled to receive a bonus award if the employee is not employed by International Paper at the time the bonus is actually paid. It is undisputed that Suwyn was not employed at International Paper in February 1996 when the payments were made.

### a. Express Contract

■ Defendants first contend that certain pre-employment promises made to him by Georges and the terms of the Employment Letter constituted a binding contract entitling him to receive the MIP bonus award for 1995. Plaintiff, in turn, disputes defendant's characterization of those conversations and the letter, arguing that no such legally binding contract exists.

This Court need not, however, resolve the question of whether a valid employment agreement was in place between Suwyn and International Paper. Even assuming, *arguendo*, that one did, its terms as described by the defendants do not establish Suwyn's entitlement to an MIP award for 1995. The Employment Letter, upon which the defendants, in part, base their contract claim, merely states that in addition to his base salary, Suwyn would "be eligible to participate in International Paper's Management Incentive Plan (MIP)." Although, as defendants note, the letter continues by stating, using language of certainty rather than contingency, that Suwyn's "MIP award *will be* prorated on a monthly basis," it is clear that that sentence is predicated on the sentence that precedes it. In other words, only if Suwyn were eligible to receive and did receive an MIP bonus award, would it be prorated on a monthly basis.

Moreover, even if this Court were to find that Suwyn was entitled to a bonus rather than mere eligibility to participate in an award program, according to Suwyn's own testimony, he was not simply promised an annual bonus award, but rather was offered a specific type of bonus—an MIP award—which implicitly is governed by the terms of MIP. As discussed above, the MIP provides that "[i]f the participant's employment with the Company is terminated for any reason other than death, disability or retirement prior to actual payment of an award under this Plan, the award shall be canceled and shall not be payable." Under the terms of the MIP, Suwyn's resignation, tendered before the 1995 bonus awards were made, resulted in the cancellation of his bonus award. Accordingly, defendants' counterclaim alleging breach of an express contract is dismissed.

### b. Implied Contract and Quantum Meruit

■ Suwyn further seeks a declaration that he is entitled to his 1995 MIP award, under implied contract and quantum meruit theories. Under both theories, the claimant must have a reasonable expectancy of receiving compensation. *See Argo Marine Systems, Inc. v. Camar Corp.,* 755 F.2d 1006, 1011 (2d Cir.1985); *American–European Art Associates, Inc. v. Trend Galleries, Inc.,* 227 A.D.2d 170, 641 N.Y.S.2d 835 (1st Dep't 1996). Plaintiff contends that any alleged expectation on the part of Suwyn was unreasonable because the terms of the MIP clearly state that a plan participant must be employed by International Paper on the date the bonus is paid in order to receive an MIP bonus. The Court agrees. *See Allison v. Fundamental Brokers,* 90 Civ. 4305, 1991 WL 51081 (S.D.N.Y. Apr.3, 1991) (dismissing implied contract claim where a writing expressly conditioned receipt of each bonus installment upon plaintiff's employment on payment date).

Here, Suwyn does not dispute having received a copy of the MIP setting forth the terms upon which his MIP bonus would be awarded. Indeed, it appears from the testimony of Thomas Neff of SpencerStuart, who discussed the proposed compensation package for Suwyn when he joined Louisiana–Pacific, that Suwyn knew that International Paper's practice was not to pay MIP awards to employees who voluntarily resign prior to the date the award is paid. Neff testified that typically, when a senior executive leaves one company to go to another, it is standard procedure for the new company to compensate the new executive for any lost benefits as a result of the change. *See* Tr. at 84. Suwyn himself drafted a letter to Neff set-

ting forth the value of that lost compensation, which included his 1995 bonus.

I therefore find that, based on the terms of the MIP, and on Suwyn's representations to Neff and Louisiana–Pacific that he would forfeit the bonus, Suwyn had no reasonable expectation of receiving his 1995 MIP bonus. The implied contract and quantum meruit claims are accordingly dismissed.

#### c. *New York Labor Law § 190*

■ Suwyn's final counterclaim alleges that Suwyn's annual MIP awards were part of his wages as an employee of International Paper, the nonpayment of which violated article 6 of New York Labor Law. N.Y. Labor Law §§ 190–199. Section 190 defines "wages" as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." N.Y. Labor Law § 190(1).

■ The Court finds that the 1995 unpaid bonus does not constitute "wages" within the meaning of section 190(1). Under New York law, "incentive compensation based on factors falling outside the scope of the employee's actual work is precluded from statutory coverage." *Tischmann v. ITT/Sheraton Corp.*, 882 F.Supp. 1358 (S.D.N.Y.1995); *see, Samuels v. Thomas Crimmins Contracting Co.*, 91 Civ. 6657, 1993 WL 36168, at *7 (S.D.N.Y. Feb.9, 1993) (promised bonus was incentive compensation not covered by section 190(1) where it was not based on the employee's performance); *Dean Witter Reynolds, Inc. v. Ross*, 75 A.D.2d 373, 429 N.Y.S.2d 653, 658 (1st Dep't 1980) (incentive plan tying an employee's bonus to overall output rate of the department fell outside the purview of section 190); *see also Canet v. Travelstead*, 917 F.Supp. 969, 995 (E.D.N.Y. 1996) ("The weight of authority holds that incentive compensation does not constitute 'wages' under the New York Labor Law."); *Magness v. Human Resource Services, Inc.*, 161 A.D.2d 418, 555 N.Y.S.2d 347, 349 (1st Dep't 1990).

The MIP bonus award plan is, by its express terms, an incentive plan designed to increase both corporate and individual performance. The plan's goal is "to provide greater incentive for participants to exert their best efforts to increase the profitability of the company." Its funding is based on International Paper's achievement of certain financial and nonfinancial objectives, and is triggered only if a specified level of net after-tax earnings and predetermined nonfinancial targets are achieved by the company. It does not appear, from the terms of the MIP, or the testimony before this Court, that the award of the bonus was based on Suwyn's own performance, or that the actual payment of a bonus was guaranteed as a term of employment. *Cf. Giuntoli v. Garvin Guybutler Corp.*, 726 F.Supp. 494, 508–09 (S.D.N.Y.1989). I therefore conclude that the MIP bonus award does not fall within section 190's definition of "wages." Accordingly, defendants' claim alleging violations of New York Labor Law § 190 *et al.*, is dismissed.

### CONCLUSION

For the reasons stated above, defendants' counterclaims are dismissed. The Clerk of the Court is directed to enter judgment dismissing them and closing the case.

### SO ORDERED