**Barbara HAHN, Armand Ehrlein, Roberta Hayes, Brett Smith and Michael F. Kaczynski, on behalf of themselves and others similarly situated, Plaintiff,**

v.

**NATIONAL WESTMINSTER BANK, N.A. t/a Fleet Bank of New York, N.A., Defendant.**

**No. CV 00–452.**

United States District Court, E.D. New York.

June 12, 2000.

Bracken & Margolin, LLP, by Linda U. Margolin, Islandia, NY, for Plaintiff.

Cleary, Gottleib, Steen & Hamilton, by Richard F. Ziegler, Carmine D. Boccuzzi, New York City, for Defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiffs commenced this case seeking to recover the full value of benefits they claim as former employees of National Westminster Bank, N.A. The complaint, which was originally commenced in the state court and thereafter removed, contains two causes of action—one for breach of contract and a federal claim brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").

Presently before the court is Defendant's motion to dismiss the ERISA cause of action for failure to state a claim as well as Plaintiff's motion for class certification. For the reasons that follow, Defendant's motion to dismiss is granted. As the ERISA claim was the sole basis for federal jurisdiction, the court declines to exercise jurisdiction over the state court breach of contract claim. The court also declines to reach the issue of the propriety of class certification with respect to this remaining state law claim. Because this case was originally commenced in the State Court, the court remands this action, pursuant to 28 U.S.C. § 1447(c), to the Supreme Court of the State of New York, County of Suffolk.

## BACKGROUND

### I. The Parties

Plaintiffs are individuals who were employed by National Westminster Bancorp, Inc. ("Bancorp"). In this lawsuit, Plaintiffs seek to enforce their rights (alleged to be both contractual and pursuant to ERISA) under a plan known as the "Phantom Stock Appreciation Plan of National Westminster Bancorp as Amended and Restated April 1994" (hereinafter the "Plan," the "Phantom Stock Plan" or the "PSP").

Plaintiffs received payments which came due under the PSP after a merger (the "Merger") that resulted in the sale of Bancorp's assets and business to Fleet Bank of New York, N.A. ("Fleet").[1] Essentially, Plaintiffs argue that the payments received were improperly valued. According to the complaint, Plaintiffs' shares should

---

1. While the exact terms of the Merger are unclear to the court, it appears that Bancorp's assets and business were sold by Bancorp's parent company to Fleet Financial Group, the parent company of Fleet Bank of N.Y., N.A. In any event, knowledge of the precise structure of the Merger is unnecessary to the decision herein.

have been valued at approximately $108.00 per share and were instead, valued at only $37.00 per share. They seek here the difference between these two values as well as costs and attorneys' fees pursuant to ERISA.

## II. *The Phantom Stock Plan*

The Phantom Stock Plan is properly before the court in the context of this Rule 12 motion. *See Albers v. The Guardian Life Ins. Co. of America,* 1999 WL 228367 *2 (April 19, 1999) ("[w]here the record contains the undisputed terms of the disputed plan ... a Court may decide the applicability of ERISA as a matter of law" in the context of a Rule 12(b)(6) motion), quoting, *Foster v. Bell Atlantic Tricon Leasing Corp.,* 1994 WL 150830 (S.D.N.Y. April 20, 1994). The Plan provides, in pertinent part, as follows.

The purpose of the Phantom Stock Plan, as stated therein, was to "provide key employees with financial incentives for improving the long-term performance" of Bancorp and "increasing the value" of the institution to its parent company. To these ends, the PSP provided that "Phantom Stock" would be issued to employees who "significantly affect the long-term performance [of Bancorp] and is intended to provide, in combination with other forms of compensation and benefits, a total compensation program which is competitive with the reward programs of other similar financial institutions."

The PSP set the value of shares of "Phantom Stock Awards" and defined the individuals eligible to receive such awards. Those who were eligible to receive Phantom Stock Awards were executive officers or other key employees of Bancorp. Individuals receiving Phantom Stock Awards were referred to as "Participants," under the PSP. The decision to issue Phantom Stock Awards was placed in the discretion of the Compensation Committee of the Board of Directors of Bancorp.

Each Phantom Stock Award represented the right to receive, as payment, an amount in cash equal to any appreciation in the "Fair Market Value of one Unit" (as defined in the PSP) between the date of grant of the Phantom Stock Award and the date of its exercise. In the event of a change in control of Bancorp, the PSP provided that the valuation of Phantom Stock Awards was to "reflect the purchase price for Bancorp."

The PSP set a schedule for when Phantom Stock Awards could be turned in for cash payments or "exercised." One-third of the Award was allowed to be exercised on or after one year of the date of grant, two-thirds of the Award was allowed to be exercised on or after two years from the date of the grant and the Award could be exercised in full on or any time after three years from the date of the grant.

Certain eventualities altered these time frames and the right to exercise Phantom Stock Awards under the PSP. For example, if a Participant was terminated for "cause," (including termination for a felony conviction), that employee's Phantom Stock Awards were automatically cancelled. If a Participant retired, those Phantom Stock Awards that were not exercisable as of the date of retirement become automatically vested and could be exercised three years after retirement.

If a Participant's employment with Bancorp was terminated for any reason not set forth specifically in the PSP, his Phantom Stock Awards that were not exercisable as of the date of termination were to be automatically cancelled. Those Awards that were exercisable as of the termination were automatically exercised ninety days after the termination date unless exercise was requested prior to that date.

## III. *The Merger and its Effect on PSP Participants*

As noted above, Bancorp ceased to exist as an entity once the Merger was consummated. In a memorandum dated January 19, 1996, Participants in the Bancorp PSP were advised as to the implication of the

Merger on their shares of Phantom Stock Awards. Participants were advised that when the sale to Fleet became final, the PSP would cease to exist. The final valuation of Phantom Stock Awards was stated to depend upon the precise value of the sale of Bancorp at its closing and was estimated, at the time, to be between $37.00 and $38.00 per share.

In March of 1996, the PSP was amended to allow Participants to elect to defer compensation previously payable only in cash when exercising Phantom Stock Awards. Specifically, the PSP was changed, as of March 1996, to allow the Award payments to be deferred into a trust under Bancorp's Deferred Compensation Plan.

In a memorandum dated April 5, 1996, Participants were advised of the deferral right created by the March amendment to the PSP. That memorandum informed Participants that they could participate in the NatWest Deferred Compensation Plan "in connection with your forthcoming distribution form the Phantom Stock Appreciation Plan." Participants were advised that they could elect to voluntarily defer cash to be received from the exercise of Phantom Stock Awards. The memorandum included a description of the five different investment options offered through the Deferred Compensation Plan and included forms to be filled out to exercise the rights described therein.

## IV. *Plaintiffs' Claims and Defendant's Motion*

Plaintiffs were all Participants under the PSP. Each received Phantom Stock Awards under the PSP prior to 1996. After the Merger, Plaintiffs' Awards were exercised at the rate of $37.00 per unit. As noted above, Plaintiffs allege that the

proper value of their Awards should have been approximately $108.00 per unit. They seek the difference between these amounts as damages under their breach of contract and ERISA claims. Alleging that they are part of a large class of similarly situated individuals, Plaintiffs also seek class certification.

Defendant contends that the PSP is not a "plan" under ERISA and accordingly, seeks dismissal of this sole federal claim.

## DISCUSSION

### I. *Legal Principles: Defining an ERISA Employee Pension Benefit Plan*

Plaintiffs alleged that the PSP is an employee pension benefit plan subject to regulation under ERISA.[2] ERISA defines such plans as "any plan ... established or maintained by an employer ... [which] by its express terms or as a result of surrounding circumstances ...

(1) provides retirement income to employees, or

(2) results in a deferral of income to employees, for periods extending beyond the termination of covered employment or beyond."

29 U.S.C. § 1002(2)(A).

Regulations promulgated by the Department of Labor clarify the limits of ERISA coverage and identify certain plans that do not constitute employee benefit pension plans for ERISA purposes. *See* 29 C.F.R. § 2510.3–2(a). Relevant here is the Department of Labor regulation that excludes from the definition of employee benefit plans those that involve payments made to employees "as bonuses for work performed." 29 C.F.R. § 2510.3–2(c) (hereinafter the "Regulation"); *see Emme-*

---

**2.** Plaintiffs' complaint also alleges that the PSP is an "employee welfare benefit plan" under ERISA. Plaintiffs, however, do not attempt to support such a claim and the court therefore deems the claim to have been abandoned. In any event, it is clear that the PSP does not fall into the statutory definition of such a plan since it was clearly not estab-

lished to provide the benefits referred to therein. *See* 29 U.S.C. § 1002(1). Plaintiffs have similarly failed to support the complaint's allegation regarding "top hat" plans under 29 U.S.C. § 1051(2) and the court considers any such claim to be similarly abandoned.

*negger v. Bull Moose Tube Co.,* 197 F.3d 929, 932 (8th Cir.1999); *Murphy v. Inexco Oil Co.,* 611 F.2d 570, 574 (5th Cir.1980); *Foster v. Bell Atlantic Tricon Leasing Corp.,* 1994 WL 150830 *2 (S.D.N.Y. April 20, 1994). A bonus plan excluded from ERISA will be found where payments made are not to "provide retirement income," but, instead, serve some other purpose, such as providing increased compensation as an incentive or reward for a job well done. *See International Paper Co. v. Suwyn,* 978 F.Supp. 506, 510–11 (S.D.N.Y. 1997); *see also Murphy,* 611 F.2d at 575.

Despite the regulation excluding bonus payments from ERISA coverage, such payments may fall within the ERISA definition of employee pension benefit plans if: (1) payments are "systematically deferred to the termination of covered employments or beyond" or (2) payments are designed for the purpose of providing retirement income. 29 C.F.R. § 2510.3–2(c) .

The mere fact that payments made pursuant to a plan continue after retirement does not transform an otherwise excluded bonus plan into one whose payments are "systematically deferred" to the termination of employment or one whose purpose is to provide retirement income. Thus, the fact that some payments may be made afer retirement does not necessarily result in ERISA coverage. *Murphy,* 611 F.2d at 575; *Albers,* 1999 WL 228367 *4 (April 19, 1999); *Foster,* 1994 WL 150830 * 2–3. Instead, post-retirement payments may be only "incidental to the goal of providing current compensation." *International Paper,* 978 F.Supp. at 511.

Thus, several cases have held that ERISA does not apply to a bonus plan simply because it happens to provide payments after the end of an individual's employment and thus provides a source of retirement income. *E.g., Emmenegger,* 197 F.3d at 933; *Albers,* 1999 WL 228367 *4 (April 19, 1999) (payments made after retirement may be only a "by-product" of a plan's administration); *Kaelin v. Tenneco, Inc.,* 28 F.Supp.2d 478, 486–87 (N.D.Ill.

1998) (granting of stock options that might result in post-employment payment "does not necessarily equate to a pension plan under ERISA"); *Goodrich v. CML Fiberoptics, Inc.,* 990 F.Supp. 48, 49–50 (D.Mass.1998) (plan does not provide retirement income "even if the exercise of options might result, incidentally, in some payment ... after retirement"); *Murphy,* 611 F.2d at 575 ("mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage").

Indeed, even in a case where no payments could be made until the employee reached the age of sixty-five, the usual retirement age, the court refused to hold that payments were "systematically deferred" because the employee was free to continue his employment past the age of sixty-five. *International Paper,* 978 F.Supp. at 511.

## II. *The PSP Is Not An Employee Pension Plan*

Applying the principles set forth above, the court concludes that the Phantom Stock Plan is not an employee pension plan within the meaning of ERISA, but instead constitutes a bonus plan that is not covered by the statute.

First, it is clear that the PSP was created to provide additional compensation to current employees in recognition of their value to Bancorp. The Plan's express statement of purpose (to "provide key employees with financial incentives for improving the long-term performance" of Bancorp) is entitled to weight when determining the nature of the plan. Where, as here, the plan proclaims its intent to provide bonus compensation, a pension plan will not be found. *See, e.g., Emmenegger,* 197 F.3d at 932 (holding that phantom stock plan was a bonus plan where it's stated purpose was to provide "additional incentives for industry and efficiency and compensat[ion] for services rendered to the Corporation"); *International Paper,*

978 F.Supp. at 508 (stated purpose of plan to "motivate and reward a small select group ... of executives and to align their interest with that of shareholders"); *Foster*, 1994 WL 150830 *1 (stated purpose of plan to provide additional compensation commensurate with ... performance").

Having decided that the PSP is a bonus plan within the meaning of 29 C.F.R. § 2510.3–2(c), the question arises whether the Plan is subject to either of the exceptions set forth in the Regulation. Specifically, the question is: (1) whether payments under the plan are "systematically deferred" to the post employment period or, (2) whether the Plan was designed for the purpose of providing retirement income. *See* 29 C.F.R. § 2510.3–2(c). Neither is true here.

The latter exception to bonus plans must be rejected based upon the discussion above. Clearly, the PSP was never intended for the purpose of providing retirement income.

Nor is there support for notion that the first-stated exception to the Regulation applies. The fact that certain payments could, by operation of the Plan, be granted after retirement, does not result in a finding that payments were "systematically deferred" to the post-employment period. The actual operation of the Plan was quite the opposite. Participants were free to cash in their Phantom Stock Awards while employed by Bancorp. This right was limited only by the vesting schedule set forth in the Plan, which provided for full vesting in the third year following a grant of a Phantom Stock Award. Here, as in the cases referred to above, the receipt of payments after retirement are merely "incidental" to the administration of the Plan and do not take the PSP outside of an ERISA-excluded bonus plan. *Accord Murphy*, 611 F.2d at 575; *Albers*, 1999 WL 228367 *4 (April 19, 1999) *International Paper*, 978 F.Supp. at 511; *Goodrich*, 990 F.Supp. at 49–50; *Foster*, 1994 WL 150830 * 2–3.

The fact that, beginning in March 1996, employees were given the option to defer Plan income into a trust under Bancorp's Deferred Compensation Plan does not alter the court's conclusion. Notwithstanding the March 1996 amendment, Participants retained the right to obtain an immediate cash payment in exchange for their Phantom Stock Awards. The deferral option was not, as argued by Plaintiffs, an "ERISA-significant" change. Instead, it was merely a choice provided to employees—not a requirement under the Plan sufficient to change its character.

The mere presence of an option to defer compensation to post-retirement income no more transforms the PSP into a plan covered by ERISA than the fact that payments under the PSP could continue into an employee's post-employment period. Again, such post-employment income, is merely incidental to the Plan's administration. *See Emmenegger*, 197 F.3d at 933 (where option to defer existed there was "nothing in the terms of the program that would result in such deferral with the purposeful consistency required to make deferral systematic"); *International Paper*, 978 F.Supp. at 512 (plan not requiring deferral of income did not systematically defer income). In sum, there is nothing about providing employees with a choice that results a finding of a "purposeful consistency required to make deferral systematic." *Emmenegger*, 197 F.3d at 933.

Finally, the court holds that there is a complete absence of facts to support the argument, advanced by Plaintiffs, that any "surrounding circumstances" renders the PSP an employee pension benefit plan. While the Department of Labor acknowledges that such facts may exist in certain cases, *see* Dep't of Labor Pension & Welfare Benefit Programs Op. No. 98–02A (Mar. 6, 1998), the opinion relied upon acknowledges that "surrounding circumstances" will result in a finding of ERISA coverage only if payments are systematically deferred to the post-employment period. That is not the case here and Plaintiffs have submitted no evidence raising a

question of fact with respect thereto. *Accord Emmenegger*, 197 F.3d at 933 (holding that administration of phantom stock plan was devoid of facts showing systematic deferral of compensation sufficient to render plan covered by ERISA).

III. *Remaining Issues*

In view of the fact that the ERISA claim was Plaintiff's sole ground supporting federal jurisdiction, dismissal of that claim results in the remainder only of a state law breach of contract claim. This court declines to exercise supplemental jurisdiction over such claim. Instead, the court remands this case to the Supreme Court of the State of New York, County of Suffolk County, for lack of federal jurisdiction.

The court expresses no opinion regarding the motion for class certification. Instead, the court denies the motion, without prejudice to renewal of such motion in the State court.

### CONCLUSION

Defendant's motion to dismiss the complaint is granted. The Clerk of the Court is directed to close this case and remand the matter to the Supreme Court of the State of New York, County of Suffolk.

SO ORDERED